Ex. 6

## AMERICAN ARBITRATION ASSOCIATION
## CONSUMER ARBITRATION PROCESS

VERONICA DAVIS,

      Claimant,

                                    CASE NO.: 01-17-006-8007

-VS-

CONN APPLIANCES, INC.,

      Respondent.

_____

### RESPONDENT CONN APPLIANCES, INC.'S ARBITRATION BRIEF

Respondent Conn Appliances, Inc. ("Conn's" and "Conn Appliances") hereby respectfully submits its Post-hearing Brief.

## INTRODUCTION

The evidence is in and the evidence is clear—Conn's did not use an automatic telephone dialing system ("ATDS") to call the Claimant.  Instead, Conn's used a system that required human intervention to launch every call.  Even under *Ammons*[1]—a case that is not controlling here and follows abrogated law— Conn's system does not qualify as a "predictive dialer" because: i) it predicts nothing and uses no complex algorithm; ii) it cannot dial thousands of numbers at a time; and iii) it requires human intervention including at the time a call is attempted.  So judgment must be entered in favor of Conn's.

Had Conn's used an ATDS—and it truly did not— Ms. Davis still lacks a valid claim because she did not revoke her consent to be called. Express revocation must be "reasonably" made and "clear and unequivocally" stated[2]—so there can be no room for doubt or uncertainty. But Ms. Davis did not clearly request that calls cease, did not stay on the line to have her identity verified, and repeatedly asked Conn's to "keep calling."  So she did not revoke her consent.

For these reasons, and others, judgment must be entered in favor of Conn's.

## ARGUMENT & CITATION TO AUTHORITY

### I.    THE STATUTE.

**(a) Definitions**

(1) The term "automatic telephone dialing system" means equipment which has the capacity—

(A) to store or produce telephone numbers to be called, using a random or sequential number generator; and
(B) to dial such numbers

[…]

---

[1] *Ammons v. Ally Fin., Inc.*, 326 F. Supp. 3d 578 (M.D. Tenn. 2018).
[2] *See Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 955 (9th Cir. 2009) (interpreting "express consent" to require "consent that is clearly and unmistakingly stated.")

**(b) Restrictions on the use of automated telephone equipment**

> It shall be unlawful for any person within the United States, . . . –
>
>> (A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice—

*See* 47 USCA § 227.

## II.      DAVIS FAILED TO PROVE USE OF AN ATDS

The burden of proving ATDS usage is on the Claimant. *See Gary v. TrueBlue, Inc.,* No. 17-cv-10544, 2018 U.S. Dist. LEXIS 128782, at *18-21 (E.D. Mich. Aug. 1, 2018).

### A.      Claimant has Failed to Demonstrate that Conn's Used Equipment that Meets the Statutory ATDS Definition.

As explained by Arbitrator Richard Wise, who granted summary judgment in favor of Conn's just weeks ago:

> [T]he clear intent of the TCPA was to outlaw certain forms of telemarketing, not to prohibit otherwise lawful contact with a debtor by that debtor's creditor seeking payment of a delinquent account. The calls made by the Respondent (as creditor) to the Claimant (as debtor) were made intentionally and for the express purpose of collecting a lawful debt. They were clearly not the result of "random" dialing by the Respondent nor the result of mere sequential number generation.

See *Brooks v. Conn's* (Jan. 11, 2019), attached hereto as Exhibit "A.

Arbitrator Wise's conclusion is echoed in the TCPA's legislative history: "[t]he Committee does not intend for this restriction to be a barrier to the **normal, expected or desired communications between businesses and their customers**. For example, a … **creditor would not be prohibited from using an automatic dialer** recorded message player **to advise a customer (at the telephone number provided by the customer) that** … **a bill had not been paid**.") See H.R. REP. No. 102-317, at 17 (1991) (Emphasis added.)

Several other arbitrators have reached the same conclusion in the last few months. *Smith v. Conn Appliances, Inc*. (January 28, 2019)(issuing final award in favor of Conn's on ATDS issue);

2

*Grace v. Conn's Appliances* (December 18, 2018)(granting summary judgment in favor of Conn's on ATDS issue); *Vargas v. Conn's* (December 5, 2018)(granting summary judgment in favor of Conn's on ATDS issue); attached hereto as Exhibits "B," "C," and "D," respectively.

In addition to the arbitrators noted above, three United States District Courts have reached the same conclusion in TCPA cases in the last 90 days:

- The Northern District of Illinois held: "The phrase 'using a random or sequential number generator' applies to the numbers to be called and *an ATDS must either store or produce those numbers (and then dial them). Curated lists developed without random or sequential number generation capacity fall outside the statute's scope.*" *Johnson v. Yahoo!, Inc.*, 2018 WL 6426677, at * 2 (N.D. Ill. 2018).
- The Eastern District of Pennsylvania held: it was required to conclude that the predictive dialer used by defendants did not, as a matter of law, satisfy the statutory definition of ATDS because it could not generate random or sequential numbers. *Richardson v. Verde Energy United States*, No. 15-6325, 2018 U.S. Dist. LEXIS 212558, (E.D. Pa. Dec. 14, 2018).
- The Northern District of Iowa explained: "The Court finds that a device meets the definition of an ATDS only when it is capable of randomly or sequentially producing, or randomly or sequentially storing, telephone numbers. […]. *Harbach v. USAA Federal Savings Bank*, 2019 WL 149711 at *12 (N.D. IA January 9, 2019)

Here, Claimant stipulated that Conn's telephone system does not utilize a random or sequential number generator to generate phone numbers to dial. See *Transcript of Proceedings* ("Trans."), p. 425 lns. 9-16. As Conn's system did not use a random or sequential number generator it did not use an ATDS and prevails on the dialer-component of this case.

**B.     The *Ammons* ATDS Formulation is not Binding or Correct – But Even Applying *Ammons* Conn's Still Prevails in This Case.**

Claimant makes much of *Ammons* arguing that it is both somehow binding on the Arbitrator and dispositive of the case in her favor. It is neither.

### 1. *Ammons* Is not Binding in this Case

The consumer agreement between Conn's and the Claimant provides "[t]his contract shall be governed by the laws of the State of Tennessee and applicable federal law." See Exhibit J1. Claimant argues that this language makes *Ammons* binding. Claimant is wrong.

*Ammons* does not purport to apply Tennessee law except for two unremarkable propositions of contract law—neither of which are pertinent to the ATDS review.[3] This is unsurprising since the definitions within the TCPA are a matter of federal law and are not subject to state law rules of interpretation. *See Vaca v. Sipes*, 386 U.S. 171, 177 (1967) (it is "obvious" that federal law and not state law applies to federal statutes.)

Instead, the arbitrator must apply binding federal law to this suit. *Ammons* amounts to a tiny sliver of the vast body of federal law interpreting the TCPA, and as a district court opinion *Ammons* is not binding on any topic in any court. *See Fishman & Tobin, Inc. v. Tropical Shipping & Constr. Co.*, 240 F.3d 956, 965 (11th Cir. 2001) (holding that a "district court cannot be said to be bound by a decision of one of its brother or sister judges."). So the Arbitrator need not apply *Ammons* in this case. Indeed, to the extent *Ammons* misapplies, misstates or is out-of-step with the weight of federal law, the Arbitrator must disregard *Ammons* in favor of better-reasoned authority. *See Montes v. Shearson Lehman Bros., Inc.*, 128 F.3d 1456, 1459-60 (11th Cir. 1997) ("When a claim arises under specific laws, however, the arbitrators are bound to follow those laws….").

### 2. *Ammons* is Incorrect and Contrary to the Reasoning of More Recent Opinions

As applicable to the ATDS inquiry, the crux of *Ammons* is its holding that the FCC's 2003 and 2008 Predictive Dialer rulings survived *ACA Int'l. See Ammons*, 326 F. Supp. 3d at 587.

In reaching that conclusion *Ammons* overlooked—or at least downplayed—that *ACA Int'l* expressly exercised jurisdiction to review the FCC's 2003 and 2008 Predictive Dialer rulings[4] and concluded that those earlier FCC rulings were inconsistent with the FCC's own later determinations regarding ATDS functionalities. *ACA Int'l v. FCC*, 885 F.3d 687, 701 (D.C. Cir. 2018) (holding that the court had jurisdiction to review the 2003 and 2008 FCC Predictive Dialer

---

[3] *Ammons* applies Tennessee law for two basic contract issues unrelated to the ATDS issue: i) a waiver is ineffective unless it is knowing and voluntary; and ii) vague terms are to be read against their drafters. *Ammons* at p. 29.
[4] *See In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14092 (2003) ("2003 FCC Predictive Dialer Ruling"); *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C. Rcd. 559, 566 (2008) ("2008 Predictive Dialer Ruling") ("affirm[ing] that a predictive dialer constitutes an [ATDS].").

Rulings and rejecting the FCC's argument that "because there was no timely appeal from those previous orders, it is too late now to raise a challenge by seeking review of a more recent declaratory ruling that essentially ratifie[d] the previous ones."); *see also Sessions v. Barclays Bank Delaware*, 1:17–CV–01600–LMM, 2018 WL 3134439 at *4-5 (N.D. Ga. June 25, 2018). Specifically, the 2003 and 2008 Predictive Dialer rulings looked at non-statutory functionalities— the ability to dial thousands of numbers at a time without human intervention— as sufficient to trigger TCPA coverage. Yet the 2015 TCPA Omnibus ruling inconsistently focused on the statutory requirements of random and sequential number generation. It was for that very reason that the Court found the FCC's 2015 TCPA Omnibus ruling to be at war with itself, and struck it down as arbitrary and capricious. *ACA Int'l*, 885 F.3d  at 702-03 ("So which is it: does a device qualify as an ATDS only if it can generate random or sequential numbers to be dialed, or can it so qualify even if it lacks that capacity? The 2015 ruling, while speaking to the  [*703]  question in several ways, gives no clear answer (and in fact seems to give both answers.").

At the time *Ammons* was decided the district courts were badly split over the proper analysis of *ACA Int'l*.[5] Since then, however, the law has moved on and Courts are now nearly uniform in concluding that *ACA Int'l* set aside the FCC's 2003 and 2008 rulings by necessary implication, if not expressly.[6]  Indeed, **two Circuit Courts of Appeal** have weighed in and *both* have taken positions contrary to *Ammons*. First, the Third Circuit's *Dominguez* ruling held that random or sequential number generation was necessary to prove a TCPA claim following *ACA Int'l*—a conclusion antithetical to the survival of the 2003 and 2008 predictive dialer rulings. *See Dominguez v. Yahoo, Inc.,* 894 F.3d 116, 121 (3d Cir. 2018) (affirming dismissal of a TCPA case as plaintiff could not demonstrate system had "the present capacity to function as an autodialer by

---

[5] *Compare Lord v. Kisling,* No. 1:17-CV-01739, 2018 U.S. Dist. LEXIS 116288 (N.D. Oh. July 12, 2018) (FCC Predictive Dialer Rulings no longer binding); *Pinkus v. Sirius Xm Radio*, 16 C 10858, 2018 U.S. Dist. LEXIS 125043 (N.D. Ill. July 26, 2018) (same); *with Reyes v. BCA Fin. Servs., Inc,.* No.: 1:16-cv-24077-JG, 2018 U.S. Dist. LEXIS 80690 (S.D. Fla. May 14, 2018) (Predictive Dialer Rulings still applicable);  and *Swaney v. Regions Bank*, No.: 2:13-cv-00544-JHE, 2015 U.S. Dist. LEXIS 184751 (N.D. Ala. May 22, 2018) (same).
[6] *See Washington v. Six Continents Hotels*, No. 2:16-CV-03719-ODW-JEM, 2018 U.S. Dist. LEXIS 145639 (C.D. Cal. Aug. 24, 2018)(*ACA Int'l* set aside all FCC ATDS formulations in every order); *Roark v. Credit One Bank, N.A.*, No. CV 16-173 (PAM/ECW), 2018 WL 5921652 (D. Minn. Nov. 13, 2018)(same); *Thompson-Harbach v. USAA Federal Savings Bank*, No. 15-CV-2098, 2019 U.S. Dist. LEXIS 3687 (N.D. Iowa Jan. 9, 2019)(same).

generating random or sequential telephone numbers and dialing those numbers."). But most conclusive was the Ninth Circuit's ruling in *Marks:* "because the D.C. Circuit exercised its authority to set aside the FCC's interpretations of the definition of an ATDS in the 2015 order, **and any prior FCC rules that were reinstated by the 2015 order**, we conclude that the FCC's prior orders on that issue are no longer binding on us." *Marks* at 1049. *Marks* goes on to rule that "**the D.C. Circuit vacated the FCC's interpretation of what sort of device qualified as an ATDS, [so] only the statutory definition of ATDS as set forth by Congress in 1991 remains**." *Id.*

After *Marks* only two district courts have concluded that the Predictive Dialer rulings survived *ACA Int'l.* First, in *Maes v. Charter*, Case No. 18-cv-00124, 2018 U.S. Dist. LEXIS 185183 (W.D. Wisc. Oct. 30, 2018) the Court gave short-shrift to *Marks* and reasoned that *ACA Int'l* only reviewed the 2003 Order for the purpose of pointing out its contradiction with the 2015 Order. Then again the *Maes* court noted that *Marks* was "published after the parties here completed their briefing..." suggesting that it did not spend much time analyzing the issue. *Maes*, 2018 U.S. Dist. LEXIS 185183 at *10-11. Whatever drove the result in *Maes*, *ACA Int'l* certainly did not *affirm* the 2003 Order; rather it noted that the FCC had acted inconsistently on defining ATDS and had to go back and try it again. Until it does, the statutory definition of an ATDS prevails. *Marks* at 1049.

The second case—*Wilson v. Quest Diagnostics Inc.*, No. 2:18-11960, 2018 U.S. Dist. LEXIS 212023 (D.N.J. Dec. 10, 2018)— is even less convincing. *Wilson* interprets *Dominguez*— a case that holds directly that random or sequential number generation is necessary to state a TCPA claim—as requiring adherence to the 2003 and 2008 predictive dialer rulings. See *Wilson*, 2018 U.S. Dist. LEXIS 212023 at *7. The *Wilson* court gets there by stretching a one-liner from the *Dominguez* case beyond its moorings— but the *Dominguz* observation that "we interpret the statutory definition of an autodialer as we did prior to the issuance of 2015 Declaratory Ruling" was made in conjunction with the following sentence reading: "Dominguez can no longer rely on his argument that the Email SMS Service had the latent or potential capacity to function as autodialer." See *Dominguez*, 894 F.3d at 119. In other words, the Third Circuit Court of Appeal

held that the court would assess the *capacity* of an ATDS in the manner it had prior to 2015, it was not thereby affirming or ratifying the FCC's earlier ATDS work. *See Richadson,* 2018 U.S. Dist. LEXIS 212558 at *22 (*Dominguez* "stands for the proposition that, to qualify as an ATDS, calling equipment must have the capacity to generate numbers using a random or sequential number generator and then call those numbers.")

In short, the reasoning of *Ammons* has withered on the vine. Recent authority commands the conclusion that the Arbitrator must apply the statutory language, not prior FCC rulings.

### 3. Even if *Ammons* is Applied Conn's Did Not Use an ATDS.
#### a. Conn's System Does Not Meet the FCC's Definition of a Predictive Dialer.

*Ammons* holds that the 2003 and 2008 Predictive Dialer Rulings are binding and must be followed. *Ammons*, 326 F. Supp. 3d at 587.  But the 2003 and 2008 Predictive Dialer Rulings address certain specific functionalities—the ability to dial thousands of numbers in a short period of time without human intervention—that Conn's does not utilize. *See* 2003 FCC Predictive Dialer Ruling, 18 F.C.C. Rcd. 14014 at ¶¶ 131-32; 2008 FCC Predictive Dialer Ruling, 23 F.C.C. Rcd. 559 at ¶¶ 12-14. The orders also address a predictive dialer's use of sophisticated algorithms to predict when an agent or called party will be available to take a call—functions that Conn's also does not utilize. *See* 2003 FCC Predictive Dialer Ruling, 18 F.C.C. Rcd. 14014 at ¶ 131 ("The principal feature of predictive dialing software is a timing function, not number storage or generation.")

The evidence in this case was crystal clear—Conn's telephone system does not dial thousands of numbers at a time without human intervention. It does not predict anything. Conn's does not use a predictive dialer. Transc. p. 290 lns. 1-3. ("Q: Does Conn's utilize a predictive dialer?" A: "No.") Rather every call is initiated by a human agent pressing "resume" to open an available telephone line. Transc., p. 292 ln. 15- p. 295 ln. 5.  Then, and only then, does an attempted call commence. *Ibid.* And the agent's click of the button does not commence thousands of calls at a time. Claimant's counsel contended that 2-5 attempted calls at a time, but the witness never

confirmed that number, Transc., p. 295 ln. 19-23; p. 326 lns. 15-21, and the true facts are that, at most, 1-3 calls can be launched per click. The calls are placed based upon agent availability and the human agent manually clicking on his or her availability and under the watchful eyes of human campaign managers—the credit system team, not a computer algorithm. Transc., pp. 51-58; and 300 ln. 11- p. 301 ln. 10.

Unsurprisingly, these sorts of "click-to-dial" systems have been repeatedly found to not qualify as an ATDS—even by courts applying the 2003 Predictive Dialer Ruling.[7] And Conn's system is very different then the stipulated predictive dialer in *Ammons*—there the only human intervention was the availability of an agent to field phone calls after they were launched. *See Ammons*, 326 F. Supp. 3d at 588. So Conn's dialer plainly is not a "predictive dialer" as defined by the FCC.

Claimant tries to fit a square peg in a round hole by asserting that Conn's telephone system may make more than 2-5 attempts following a single click. Maybe, but not *at a time*. The most calls attempted at a time are 1-3 and only after the human agent manually clicks his/her availability. So the system is categorically not dialing thousands of numbers without human intervention—at max it is attempting five calls without human intervention and no more than that until those five calls comes to conclusion.[8] Any way you slice it, therefore, Conn's system is just not a "predictive" dialer under *Ammons* or the FCC's Predictive Dialer rulings.

**B.    Plaintiff's "Gotcha" Evidence of Stray References to "Predictive" Dialers by Conn's is Unpersuasive.**

---

[7] *Maddox v. CBE Grp., Inc.*, No.: 1:17-cv-1909-SCJ, 2018 WL 2327037 (N.D. Ga. May 22, 2018)(applying FCC's 2003 predictive dialer ruling but finding click-to-dial system not an ATDS due to human intervention); *Ramos v. Hopele of Fort Lauderdale*, 334 F. Supp. 3d 1262, 1273-76 (S.D. Fl. Aug. 16, 2018) (applying 2003 predictive dialer ruling but finding dialer not an due to human intervention)(report and recommendation adopted *Ramos v. Hopele of Fort Lauderdale, LLC*, 2018 WL 4568428 (S.D. Fla. Sept. 20, 2018)); *Glasser v. Hilton Grand Vacations Co.*, No. 8:16-cv-952-JDW-AAS, 2018 U.S. Dist. LEXIS 162867 (M.D. Fla. Sep. 24, 2018) (applying predictive dialer rulings but Defendant wins because human intervention was required to launch calls.)

[8] Assuming a 10% connect rate, an agent might sit through 50 attempted calls—again launched at no more than five attempts (and probably only two attempts) at a time— before a connection occurred and human intervention was required to re-start the process. 50 attempted calls—again with no more than five occurring at once—is a far cry from the "thousands" of numbers to be dialed without human intervention governed by the FCC.

Disregarding the truth of the matter, Claimant set about trying to convince the arbitrator Conn's used a predictive dialer with a carefully-crafted ambush. But this "evidence" proved only that Conn's lacks consciousness of guilt—its employees innocently use loose language.  But the cold hard fact remains that Conn's system does not dial predictively or automatically.

For instance, Claimant argues that Conn's uses an ATDS because its policies, disclosures and contracts refer to the TCPA and "autodialers." But as Conn's witness testified repeatedly, this was merely Conn's way of being conservative and attempting to better secure itself against any wayward TCPA lawsuits by obtaining consent and generating policies designed to follow TCPA "guideposts" even though the statute is not directly applicable to Conn's. Transc. p. 45 ln. 12-p. 4 ln. 20. Obviously a party's effort to be conservative with its policies should not be read against it as proof that it is bound by a statute that has no true application.

Next, claimant introduced undisclosed deposition testimony of a Conn's witness from a different case who was struggling to answer questions employing the undefined term "predictive." That was a cheap trick.  That Conn's witness was never told what a "predictive" dialer was under the deposition—the transcript is devoid of any definition or affirmative assertion by the Conn's witness that it used a predictive dialer—and Claimant's counsel was obviously baiting the witness to use the word. But the evidentiary value of the testimony is greatly diminished by the fact that the word "predictive dialer" is a commonly misused phrase in the industry, as Conn's witness explained at the arbitration hearing. Transc., p. 119 lns. 3-25 (the term "predictive" was used "very generically" across the industry and at Conn's during certain timeframes.)

The tricks didn't end there. Claimant also found a stray reference to "predictive" in Conn's policies and—after building suspense with a redacted version of the policy—revealed with glee that Conn's witness Mr. Walton had himself approved a version change in 2016. Claimant also dredged up an old 10-k filings from filed by Conn's with the SEC referencing a predictive dialer. This is "gotcha" stuff introduced more for effect than on any probative point.  Yes, loose language

was used by Conn's employees to reference its telephone system, but that does not mean that Conn's system actually had the capacity[9] to dial in the manner described by the FCC.

That leaves just the template dialer manual referencing licenses and functionalities that Conn's does not employ. Claimant's counsel references the "cancel dial feature" noted in the Noble manual. But this manual is not unique to Conn's dialer and is a general template manual for all products Noble licenses. See Trans. p. 300 lns. 3-10 (Q: "Is that manual specific to Conn's dialer?" A: "No, sir."; Q. "Are all of he features and programs and licensed discussed in that manual applicable to your dialer?" A: "No, sir.") So whereas Claimant is correct that the "cancel dial feature" applies to "predictive outbound dialing,"[10] that is just *one* campaign type where that feature applies. See Transc., p. 105 lns. 10-17 ("If enabled, cancel dial applies **to all pacing types except…**"). But just because "predictive campaigns" are one type of campaign that the "cancel dial" feature can apply to, it does not follow that Conn's had a predictive dialer licensed from Noble. It doesn't.  Transc. p. 290 lns. 1-3. [11]  So Conn's prevails even if *Ammons* is followed.

### C.    The Arbitrator Should Not Apply *Marks* Because Conn's Telephone System Does Not Store Numbers and Dial Automatically Anyway

#### 1. The *Marks* ATDS Formulation Should Not Be Followed

In *Marks*, the Ninth Circuit found the statutory definition of an ATDS ambiguous; a baffling conclusion given that the Ninth Circuit had previously ruled the definition of ATDS is "clear and unambiguous." *See Satterfield v. Simon & Schuster, Inc.,* 569 F.3d 946, 951 (9th Cir. 2009) (noting "the statute's clear language" and reading the phrase "to store or produce telephone numbers to be called, using a random or sequential number generator" to mean "store, produce, or call randomly or sequentially generated telephone numbers.").  Nonetheless, the *Marks* court used this new-found "ambiguity" to re-write the term "ATDS" to mean equipment that has the capacity

---

[9] The capacity that matters for purposes of the TCPA is the "current" capacity of the system to operate as an ATDS, not any potential capacity. *See Dominguez,* 894 F.3d at 119.
[10] Transc. p. 105 ln. 10-106 ln. 6.
[11] Claimant also briefly addressed an attorney-work product compilation document that has already been the subject of a clawback order by another arbitrator. That evidence is properly disregarded. *See* Fed. R. Evid. 502(b) & (d).

to (1) store numbers to be called **or** (2) to produce numbers to be called, using a random or sequential number generator – and to dial such numbers. *Marks* at 1053.

*Marks* has been criticized by a number of recent district court decisions for re-writing the statute to remove critical language regarding the use of a random or sequential number generator.[12] Moreover the conclusion of *Marks* that Congress ratified its definition by amending the statute in 2015—the core of its reasoning— without altering the ATDS definition overlooks:

i) the *Marks* formulation does not match the FCC's formulation so there was never an opportunity for Congress to ratify the new *Marks* definition;

ii) "Congress cannot by its silence ratify an administrative interpretation that is contrary to the plain meaning of the Act." *Ashton v. Pierce*, 716 F.2d 56, 63 (D.C. Cir. 1983); and

iii)  Bills are pending in both the House and the Senate to amend the TCPA to include dialers that dial from a list of numbers without human intervention[13]—bills that would be totally unnecessary if Congress thought *Marks* was the law of the land.

Accordingly, Conn's respectfully submits that the arbitrator should apply the statute as written by Congress, not as re-written by the Ninth Circuit Court of Appeal.

### 2. Even if *Marks* is Applied *Conn's* Telephone System Does not Store and Dial Numbers "Automatically."

Even under *Marks,* where a telephone system makes calls using human intervention it does not dial "automatically." See *Hatuey v. Ic Sys.,* No. 1:16-cv-12542-DPW, 2018 U.S. Dist. LEXIS 193713 (D. Mass. Nov. 14, 2018) (click to dial system not an ATDS even following *Marks* definition). The *Hatuey* court held that because human intervention was required for a call to launch, the system was not an ATDS even under "a broad reading of the FCC's definition of an ATDS." *Id.* at *16. Other courts have reached similar results based on the presence of human

---

[12] See *Harbach v. USAA Federal Savings Bank*, 2019 WL 149711 at *12 (N.D. IA January 9, 2019)(rejecting *Marks* as misreading unambiguous statute); *Johnson v. Yahoo!, Inc*., 2018 WL 6426677, at * 2 (N.D. Ill. 2018)(same); *Roark v. Credit One Bank*, N.A. Civ. No. 16-173 (PAM/ECW) 2018 WL 5921652 (D. Minn. Nov. 13, 2018)(same).
[13] *See* H.R. 6026, *Stopping Bad Robocalls Act*, Introduced in House June 7, 2018, *available at* https://www.congress.gov/bill/115th-congress/house-bill/6026/text; S.3078, *Stopping Bad Robocalls Act*, Introduced in Senate June 18, 2018, *available at* https://www.congress.gov/bill/115th-congress/senate-bill/3078/text.

intervention. *See Ramos,* 334 F. Supp. 3d at 1273-76 ("human intervention" test from FCC's 2003 predictive dialer rulings survived ACA Int'l but text dialer not an ATDS at MSJ phase).

As the evidence at the hearing proved, Conn's telephonic system requires several layers of human intervention to launch a call. The credit systems team sets establishes parameters for what numbers will be called and when, loads the numbers and account systems to the telephonic system, and continuously makes adjustments to what numbers will be called throughout the work day. See Transc., pp. 51-60. But most critically each and every call cannot commence until an agent clicks "resume" to open a line. Transc., p. 292 ln. 15- p. 295 ln. 5

This "click to dial" functionality is the exact "human intervention" found to thwart the application of *Marks* in *Hatuey v. Ic Sys.,* and the Arbitrator should reach the same conclusion— even if *Marks* is applied, Conn's system does not dial "automatically" from "stored" numbers. [14]

## III.   CLAIMANT FAILED TO PROVE ANY ATTEMPTED PRE-RECORDED MESSAGE ACTUALLY PLAYED OR THAT ANY TEXT MESSAGES WERE SENT USING AN ATDS.

Liability for pre-recorded calls attaches only if the message actually plays. *Ybarra v. Dish Network, LLC*, 807 F.3d 635, 641. (5th Cir. 2015). The burden of proving a call actually played is plainly on the Claimant. *Morris v. United Healthcare Ins. Co.*, No. 4:15-CV-00638-ALM-CAN, 2016 U.S. Dist. LEXIS 168288, at *18-19 (E.D. Tex. Nov. 8, 2016) (Mere speculation that an artificial or prerecorded voice may have played had the consumer answered the calls is insufficient.)  The evidence in this case was clear that Conn's attempted to leave messages for the Claimant. See Trans. p. 74 lns. 10-25 (Q: "Okay. The system detected that and left a message though, by leaving MC?" A: "That we attempted to leave a message, yes sir.") Claimant never affirmed that any messages actually played. As such there is no evidence as to which calls did, and did not, result in a message being heard by the Claimant. So Conn's prevails prerecorded voice calls.

---

[14] Notably, Claimant also failed to prove that Conn's Noble telephone system "stores" phone numbers for dialing. The evidence was that numbers are stored within a different system—A/S 400. See Transc. p. 60 ln. 21- p. 61 n. 8.

With respect to text messages, such messages are only actionable where an ATDS is used to send the text message. *See Dominguez*, 894 F.3d at 121 (affirming summary judgment to the defendant because plaintiff failed to prove that the defendant sent text messages via an ATDS); *Ramos*, 334 F. Supp. 2d at 1275-76 (granting summary judgment to the defendant because text messaging system required human intervention and was therefore not an ATDS). Claimant made no showing regarding the technology used to send texts to Ms. Davis. As such she has failed to meet her burden of demonstrating ATDS usage with respect to any text messages sent in this case.

## IV.    REVOCATION WAS NOT POSSIBLE AND DID NOT OCCUR HERE ANYWAY.

Initial consent was not at issue in this matter. Claimant provided her consent by supplying her phone number to Conn's at the time she applied for credit to purchase merchandise from Conn's. Trans. p. 353 lns. 6-23. Plaintiff also granted contractual consent as follows:

> For each telephone number you provide to seller (either directly or by placing a call to us), you consent and authorize us to place telephone calls to you at that number. Such consent expressly includes authorization for seller (and/or our affiliates and/or agents) to send text messages and/or place telephone calls to cellular or landline telephone numbers using pre-recorded or artificial voice messages, as well as calls made by an automatic dialing system.

Trans. p. 351 lns 7- 353 ln. 5 and Exhibit J-1.

Claimant contends she revoked this ironclad and clear consent. But her "revocations" were ambiguous, limited, and shifting and did not permit Conn's to verify her identity on the calls. Assuming her consent was revocable, therefore, it was not validly revoked in this case.

### A.    The Arbitrator Should Reconsider Disregarding *Reyes* in Light of the Strong Bargained-For Consent Language in this Case.

A consumer who has consented to receive calls in a written contract cannot unilaterally revoke that consent as a matter of black letter law. See *Reyes*, 861 F.3d at 56("**[i]t is black letter law that one party may not alter a bilateral contract by revoking a term without the consent of a counterparty**")(Emphasis Added); *Medley v. Dish Network,* Case No. 8:16-cv-2534-T-36TBM, 2018 U.S. Dist. LEXIS 144895, *31 (M.D. Fl. Aug. 27, 2018)("**nothing in the TCPA indicates that contractually-granted consent can be unilaterally revoked in contradiction to**

**black-letter law"**)(Emphasis Added); *See also Schweitzer v. Comenity Bank*, 866 F.3d 1273, 1274-75 (11th Cir. 2017) and *Osorio v. State Farm Bank, F.S.B*., 746 F.3d 1242, 1255 (Each holding that TCPA consent is revocable "**in the absence of any contractual restriction to the contrary**…").(Emphasis Added.) This is true even where the contractual consent provision does not directly address revocation. *Harris v. Navient Solutions,* Case No. 3:15-cv-564 (RNC), 2018 WL 3748155 at *2 (D. Conn. Aug. 7, 2018)("Like the notes at issue here, the contract at issue in Reyes was silent on revocation… [e]ven so, the Second Circuit determined that the plaintiff's bargained-for consent 'bec[a]me irrevocable' when it was granted in the contract"); cf *Ammons v. Ally Financial, Inc*., No. 3:17-cv-00505, 2018 WL 3134619 (M.D. Tenn. June 27, 2018)("there is no contractual provision that addresses, let alone restricts, revocation.").

The revocation provision accepted by Claimant in this case is extremely strong, robust and clear. Numerous arbitrators have granted judgment in Conn's favor relying on precisely the same clause. *Jeffrey Tagatz v. Conn Appliances, Inc.,* AAA Case No. 16-0003-9567 (April 16, 2018 Order) at ¶ 3 (granting Conn's judgment because "[u]nder the TCPA when a party provides consent contractually, that party cannot unilaterally revoke consent"); *Dexter Johnson v. Conn Appliances, Inc.,* AAA Case No. 16-0004-6529 (Feb. 21, 2018 Order) at ¶ 4 (judgment to Conn's because "[w]hen a party provides consent contractually as a part of a bargained for exchange, that party cannot unilaterally revoke consent just like that party cannot unilaterally modify or revoke other terms of the contract"); *Rickey Dudley v. Conn Appliances, Inc.*, AAA Case No. 16-0004-7817 (Feb. 18, 2018 Order) at ¶ 3 (granting Conn's judgment because "[u]nder the TCPA when a party provides consent contractually, that party cannot unilaterally revoke consent"); *Donnell Webster v. Conn Appliances, Inc.* Case No. 16-0003-6774 (Aug 27, 2017 Order) at p. 3 ("The bi-lateral nature of contract does not allow one person to unilaterally revoke the contractual consent previously given"); *Vianne Jackson v. Conn Appliances, Inc.,* Case No. 16-0004-6562 (Nov. 14, 2017 Order) ("[u]nder the TCPA a party is not able to revoke contractual consent….").

    **B.**    **The Standard For Revocation is High and Plaintiff's Purported Revocations Were Not Clearly and Expressly Stated in a "Reasonable" Manner**

Consent can only be effectively revoked by way of a "clear expression" that messages should stop. 2015 FCC Order, 30 FCC Rcd. 7961, 8001, ¶ 63 (2015). "Express and clear revocation of consent [for TCPA purposes is required]; implicit revocation will not do". *In re Runyan*, 530 B.R. 801, 807 (M.D. Fla. 2015); *see also Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1048 (9th Cir. 2017) (called party must "clearly express desire not to receive further []messages"). In defining "express consent" the Ninth Circuit has held that the consent must be "clearly and unmistakingly stated." *Satterfield.*, 569 F.3d at 955. Since revocation must also be "express" courts have applied a similar high standard to assessing revocation. *See Johnston v. USAA Fed. Sav. Bank*, No. 12-CV-02486-LTB-KLM, 2014 WL 5439965, at *2 (D. Colo. 2014)(non-specific request to "stop calling" insufficient to justify judgment at MSJ phase); *Herrera v. First Nat'l Bank of Omaha* 2:17-cv-01136-RSWL-SKA, 2017 WL6001718 (question of fact on revocation existed when customer said "do not call my phone"); *and see Buchholz v. Valarity, LLC*, No. 4:13CV0362 TIA, 2015 WL 590381, at *2 (E.D. Mo. Feb. 11, 2015) (question of fact whether phrase "stop calling me" was sufficient to revoke consent since the caller did not identify himself).

Further, consent can only be revoked in a "reasonable" manner. *See ACA International*, 885 F.3d at 709-10. Efforts to evade reasonable revocation channels do not effectuate a valid revocation. *Rando v. Edible Arrangements Int'l, LLC*, No. CV 17-701(JBS/AMD), 2018 WL 1523858 (D.N.J. Mar. 28, 2018); *Epps v. Earth Fare, Inc*., No. 17-55413, 2018 U.S. App. LEXIS 30312 (9th Cir. Oct. 26, 2018) (affirming dismissal of text message opt-out evader case); *see also See ACA International*, 885 F.3d at 709-10 ("The selection of an unconventional method of seeking revocation might also betray the absence of any "reasonable expectation" by the consumer that she could "effectively communicate" a revocation request in the chosen fashion.").

Conn's representative testified that had Claimant stayed on the line and had her identity validated, Conn's would have stopped calling her upon being asked to do so, consistent with policy. Transc., p. 311 ln. 19- p.  312 ln. 1. That is an eminently reasonable policy and consistent with the law requiring Conn's to keep financial matters private and not disclose information regarding debtors to third parties. *See* 15 U.S.C. § 1692d(b) ("a debt collector may not

15

communicate . . . with any person other than the consumer, his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector."); N.C. Gen. Stat. Ann. § 75-53(1) (prohibiting a creditor "from communication with any person other than the debtor or his attorney.")  It is also critical for consumer safety. If Conn's accepted un-validated instructions, it might unwittingly be assisting a fraud— an identity thief's first request might be to cut off communication to prevent fraud alerts or other account-updates that might stop the crime. *See, e.g.,* 2015 FCC Order*, 30 FCC Rcd. 7961, 8025, ¶ 129 (recognizing importance of fraud alerts and other timely communications related to identity theft).

It is also essential that Conn's have a clear understanding of what the consumer actually desires—as the law requires—so that it does not overreact and cut-off valuable information from a consumer merely because a consumer is having a bad day or is reacting in a moment of frustration without having thought through what the consumer actually wants. And it is far too easy for a consumer-turned-Plaintiff to characterize statements or conduct as a "revocation" after the fact in an effort to collect $500.00 a call. What matters in assessing a revocation, then, is not post-hac characterizations or unstated subjective intention—what matters is the words that were spoken. *See Jae v. ABC Fin. Servs.*, 2017 U.S. Dist. LEXIS 103502, at *11-12 (D. Mass. July 5, 2017) ("That standard is an objective one, requiring that the revocation must be clearly made and express a desire not to be called or texted.")(Internal quotation marks omitted).

With these principles in mind, Claimant plainly did not revoke her consent in this case. For instance, Claimant contends that she revoked her consent "for the first time" on March 13, 2017. Trans. pp. 220 lns. 10-11. But on that call Ms. Davis does not ask for calls to stop—she merely states "I'm so sick of y'all calling my phone all day long." Trans. p. 222 lns. 16-17. This does not come close to effectuating a valid revocation—it is merely a statement of her presently existing state of mind, not a request of any kind to the caller. Further, she does not stay on the line to have her identity verified. P. 223 lns. 3-14. By that point Ms. Davis was already very familiar with Conn's verification process—Transc., p. 144 lns. 3-6 (verifying identity using address); p. 170 ln. 12- p. 171 ln. 1. (verifying identity with birthdate); p. 182 ln. 13- p. 183 ln. 9. (agent trying

to confirm identity using date of birth); p. 187 lns. 15-18 (verifying identity using date of birth);
p. 203 lns. 14-18 (using SSN to verify identity); p. 217 lns. 10-12 (SSN verification)— and cannot
validly "revoke" consent by evading that verification requirement. *See ACA Int'l*, 885 F.3d at 709-
10 (revocation by an "unconventional method" is not "reasonable," and therefore not valid.).

The May 9, 2017 call is similar. There Ms. Davis states "I'm so sick of y'all. My bill is not
late. I'm going to pay it when I get ready. I keep telling y'all the same thing. Y'all just keep calling.
That's harassment. You know that, right?"[15] Trans. p. 238 lns. 8-12. Once again she does not stay
on the line to have her identity verified. Trans. p. 238 lns. 2-20 (Agent repeatedly trying to verify
who he was speaking with.) And notably, the call ends as the agent was trying to explain "I can
stop these calls for you." Trans. p. 238 ln. 22. So again Ms. Davis did not clearly and unmistakably
ask Conn's stop calls to her and did not stay on the line for identity verification to take place or to
allow the agent to actually process her revocation request.

On June 8, 2017 Ms. Davis had a brief exchange with a Conn's representative that started
with her stating Conn's was "harassing" her "every month" but concludes with Ms. Davis saying
"so y'all, it's fine, just keep calling." See Trans. p. 249 lns. 2-24. As with previous calls Ms. Davis
does not actually ask for calls to stop and does not have her identity verified.

Similarly on the first call on June 15, 2017 Ms. Davis expresses frustration—"I get so sick
of y'all calling"—before hanging up on the agent before he could verify her identity or process
her request. Again, she did not clearly ask for calls to stop. See Trans. p. 254 ln. 19- p. 255 ln. 8.

In the second June 15, 2017 call Ms. Davis explains that she had already made her payment
using a credit card before saying "Stop calling my phone." Trans. p. 256 lns. 3-5. Viewed
objectively—and recognizing that this was likely this agent's first interaction with Ms. Davis—
the request for calls to stop seemed linked to her explanation that she had already made her
payment. In other words, Ms. Davis seemed to convey that she wanted calls to stop *for her June,
2018 payment.* And that is exactly what the agent accomplished in response to this interaction.

---

[15] Although Claimant and her counsel often reference the term "harassment" there is no claim for common law
"harassment" or any other tort or statutory violation related to call volume. Instead this case is solely a TCPA case
turning on whether or not regulated technology was used in a prohibited manner.

Trans. p. 256 lns. 19-23. Ms. Davis now wants to characterize "[s]top calling my phone" as a request that Conn's never call her phone again for any purpose, but that is not what was said and— without the ability to verify Ms. Davis' identity and further understand what she was seeking— Conn's agent acted reasonably in stopping further calls only for the payment at issue.

On July 13, 2017, Ms. Davis expressed frustration with the calls but did not clearly ask for calls to stop or wait to have her identity verified. See Trans. p. 258 ln. 19-259 ln. 2.

On August 12, 2017, Ms. Davis expresses she is "sick of ya'll calling" but does not stay on the line to request calls to cease or have her identity verified. Trans. p. 266 lns. 23-25.

The calls on October 11, 2017, are similar. In the first call Ms. Davis states "I'm so sick of y'all" before hanging up without identity verification. See Trans. p. 274 lns. 17-20. In the second call Ms. Davis is more clear about her desire for calls to stop but once again did not stay on the line to have her identity verified or her request understood and processed. See Trans. p. 275 ln. 18-276 ln. 5. Indeed, the call ended with Conn's agent—once again—attempting to help the caller with her request before being cut off. See p. 276 lns. 4-5.

On October 12, 2017, Ms. Davis expresses frustration with the calls but again does not clearly request for calls to cease and does not stay on the line to have her identity verified.[16]

On October 13, 2017, Ms. Davis expresses frustration with the calls, and this time states "[s]top calling my damn phone."  See p. 281 ln. 6-7. Once again, however, Ms. Davis did not stay on the line to have her identity verified. Nonetheless, given the instruction to "stop calling my damn phone" Conn's agent elected to treat that instruction as a permanent request for Conn's to cease calling her cell phone number. See Trans. p. 281 ln. 19- p. 282 ln. 7.[17]

As is obvious by a review of these facts, Ms. Davis did not clearly and unmistakably ask

---

[16] Ms. Davis does ask for Conn's to stop calling from different numbers. The TCPA does not govern the outpulse (caller ID) number that callers must use to identify themselves. So her request that Conn's stop using different phone numbers to contact her is not actionable.

[17] Conn's made two additional attempts to the number owing to a "lag time" in updating system. Such calls are not actionable. *See* Restat. 2d of Torts, § 892A cmt. i ("Even though consent is terminated, secondary privileges may arise that permit the actor to continue to act for a reasonable time and in a reasonable manner . . . .").

for calls to stop on October 13, 2017—which Conn's honored.[18]

## V.      EVEN IF CONSENT WAS REVOKED CLAIMANT RE-CONSENTED.

Revoked consent can be re-conveyed. *See Lawrence v. Bayview Loan Servicing, LLC*, 666 F. App'x 875, 880 (11th Cir. 2016) (holding as a matter of law that the plaintiff re-consented to receiving calls after revoking consent).

As shown above, Claimant never directly instructed Conn's to stop calling her until October 13, 2017. Ironically her instructions were exactly the opposite:

- On February 11, 2017 she told the agent:

  - "I don't mind the phone calls. That's fine." Trans. p. 204 lns. 21-22.

  - "So y'all can keep calling." Trans. p. 205 ln. 25

  - "I don't mind ya'll calling." Trans. p. 206 lns. 3-4.

- On May 8, 2017 she stated:

  - "Look, y'all can keep calling all you want to." Trans. p. 236 lns. 5-6

  - "Keep calling. You got it." Trans. p. 236 ln. 23.

- On June 9, 2017 she stated:

  - "So y'all, it's fine, just keep calling." Trans. p. 249 ln. 23.

- On June 12, 2017 she stated:

  - "so you can keep calling me if you want to. That's fine with me. Okay?" Trans. p. 251 lns. 12-14.

- On August 9, 2017 she stated:

  - "Y'all call every month. You can keep calling." Trans. p. 264 lns. 4-5.

Each of these instructions to "keep calling" operated to refresh the existing consent and re-instate consent if it had been revoked.[19] *See Steinhoff v. Star Tribune Media Co., LLC,* 2014 U.S. Dist. LEXIS 38293, at *14 (D. Minn. March 24, 2014) (holding that a plaintiff who requested to

---

[18] It should not be forgotten that the entire series of events leading to this case could have been avoided as early as in Claimant's first recorded phone call with Conn's—on September 8, 2015. See Transc., p. 308 lns. 5-17. A similar exchange occurred on February 11, 2017. See Trans. p. 206 lns. 17-20. (Conn's Agent: "if you're needing a due date change or something like that, we'd be more than happy to help you with that." Claimant: "No, I'm, fine.")
[19] Indeed, these re-consents are actually much clearer than any purported revocation in this case.

be called back did not revoke consent). Notably, Ms. Davis' agreement states that by placing a call to Conn's she consents to receive calls on the number she called in on. See Ex. J-1 ("[Consent granted] [f]or each telephone number you provide to seller (either directly **or by placing a call to us**). ") So Ms. Davis' inbound calls on May 8, 2017 also separately served to re-consent to calls.[20]

## VI.    CONN'S DID NOT WILLFULLY OR KNOWINGLY VIOLATE THE TCPA IN THIS CASE.

A Defendant is not subject to enhanced damages unless the Defendant "know[s] he was performing the conduct that violates the statute." *Lary v. Trinity Physician Fin. & Ins. Servs*., 780 F. 3d 1101, 1107 (11th Cir. 2015). That is, "a Defendant must know that its actions are a violation of the TCPA in order to commit a knowing or willful violation of the statute." *Whatley v. Creditwatch Servs., LTD.*, 2014 U.S. Dist. Lexis 42992, *5 (E.D. Tex. Mar. 31, 2014).

Here there is no evidence that Conn's knew it was violating the TCPA in calling Ms. Davis. Instead, the evidence is exactly the opposite—Conn's acts conservatively to: i) obtain proper consent; ii) honor valid revocation requests; and iii) uses technology that utilizes human intervention to place calls. Moreover the facts of this case show that Conn's agents practice what its policies preach. When Conn's agent believed Ms. Davis wanted calls to stop calls regarding a specific payment on June 15, 2017, she stopped those calls. Trans. p. 256 lns. 19-23. Similarly, when Ms. Davis said clearly that Conn's should "stop calling my damn phone" on October 13, 2017, Conn's agents heeded that request. See Trans. p. 281 ln. 19- p. 282 ln. 7.  These facts show that Conn's takes TCPA compliance seriously and a finding of willfulness is not appropriate.[21]

---

[20] At the hearing, the Arbitrator raised whether honoring re-consent would amount to allowing Conn's to benefit from its own wrongdoing. But this is a rule of equity. *See SEC v. Blavin*, 557 F. Supp. 1304, 1316 (E.D. Mich. 1983) (discussing equitable remedies to prevent parties from benefitting from their own misconduct).  TCPA damages are recoverable, if at all, under legal principles and not equitable principles. *See Bruce v. Ocwen Loan Serv., LLC*, 2012 U.S. Dist. LEXIS 147897, at *4-6 (M.D. Fla. Oct. 15, 2012) (striking equitable defenses as irrelevant to a TCPA claim.) So equitable maxims have no sway here. In any event, the Sixth Circuit has made clear that the rule relates only to "intentional tortious or criminal acts." *William Beaumont Hosp. v. Fed. Ins. Co.,*552 F. App'x 494, 501 (6th Cir. 2014). Conn's conduct here was certainly not "intentional"— the testimony demonstrates that Conn's works hard to comply with the TCPA and at all times tried to call Ms. Davis lawfully.

[21] Even if a finding of willfulness is made here, the Arbitrator should exercise his discretion and *not* treble damages in this case. $500.00 per call is windfall enough.

## <u>CONCLUSION</u>

Conn Appliances respectfully requests that the Arbitrator enter an award denying all relief demanded by Claimant.

/s/ Eric J. Troutman
Eric J. Troutman, Esq.
Squire Patton Boggs (US) LLP
555 South Flower Street
55th Floor
Los Angeles, California 90071
Email:  eric.troutman@suirepb.com

Attorneys for Respondent
CONN APPLIANCES, INC.