## AMERICAN ARBITRATION ASSOCIATION

VERONICA DAVIS,

     Claimant,

vs.                                                  Case No. 01-17-0006-8007

CONN APPLIANCES, INC.,

     Respondent.

---

### CLAIMANT'S PRE-HEARING BRIEF

**I.**     **Introduction and Brief Summary**

     Claimant bought furniture from Conn's, and financed it through Conn's.  Her payment was due on the 5th of each month, but there was no late penalty so long as she paid on or before the 15th.  Claimant paid her bill every month; she never missed a payment.  But she usually did not pay by the 5th—on average, she paid around the 12th. So despite that she *did pay* her bill every month, Conn's used its predictive autodialer to call her cell phone every month. Conn's called her cell phone some times 10, 11, 12 times <u>per day</u> or more, to "remind" her to pay the bill she always paid.

     Claimant complained to Conn's repeatedly that they were harassing her, that there was no need to call her.  She pleaded with Conn's, asking why they call her dozens of times each month when she always pays her bill. When that didn't work, after receiving hundreds of these autodialer calls for more than a year, Claimant finally told Conn's that she was going to hire a lawyer if they didn't stop harassing her. Then she told Conn's a again. Then a third time. She repeatedly begged Conn's to stop calling her. And Conn's repeatedly refused to stop. That sort of harassment should be illegal, and it is.

The Telephone Consumer Protection Act (TCPA) prohibits use of an automatic telephone dialing system (ATDS) to call a cellular telephone number without consent. In this case, Claimant concedes that Respondent initially had her consent to receive ATDS calls to her cell phone. But Claimant revoked that consent, which the law allows her to do.[1] Therefore, to prevail on her TCPA claim, Claimant in this case must show:

(1)     Respondent called her cell phone using: (a) an Automatic Telephone Dialing System (ATDS); or (b) an artificial or pre-recorded message;

(2)     That Claimant told Respondent to stop calling her, thereby revoking her consent to receive those calls; and

(3)     That after Claimant revoked consent, Respondent continued to call her cell phone using: (a) an Automatic Telephone Dialing System (ATDS); or (b) an artificial or pre-recorded message.

Claimant will plainly show all three elements: (1) Claimant will show the great weight of federal regulations and case law on the subject (including in the Middle District of Tennessee) says that Respondent's predictive autodialer constitutes an ATDS because it automatically dials phone numbers without human intervention at the time of dialing; (2) Claimant will play the audio recordings of the multiple phone calls where she tells Conn's to stop calling her, thereby revoking consent; and (3) Claimant will demonstrate through phone records the number of times Conn's continued to call her, using its ATDS and pre-recorded or artificial "broadcast" messages.

Historically, Respondent's strategy in these final hearings has been to muddy the water, attempting to create confusion with a series of red herrings. To try to stop Respondent from doing so, this pre-hearing brief will lay out the simple facts of this case, and explain why the overwhelming weight of legal authority, when applied to those facts, requires a final order in her favor and against Respondent.

---

[1] This issue has already been ruled on in this case, by the Arbitrator's Order dated December 9, 2018.

II.    **Relevant Background Facts**

On August 5, 2015, Claimant purchased a sofa and a love seat from Respondent. Claimant entered into a contract to finance the furniture through Conn's. She set up a 30-month payment plan.  Conn's would receive an additional $452.89 in financing charges (20.98% on the loan of $1,542.41).  The contract contained a provision wherein Claimant consented to Conn's calling any cell phone number she provided them "using pre-recorded or artificial voice messages, as well as calls made by an automatic dialing system."

Claimant's contract stated that her first payment was due the 5th day of each month. Importantly, Claimant was told she had a 10-day grace period—the contract also said she could pay on or before the 15th of each month without incurring a late fee. Each month, Claimant paid Conn's—$70.00 on September 10, 2015; $65.00 on October 9th, and another $65.00 on November 12th. By December 2015, Claimant was actually a little ahead on her payments. By that same time, Conn's had called her cell phone more than 60 times, emailed her twice and sent her two text messages "reminding" her about her payments.

Recounting the sheer number of unnecessary and harassing phone calls Respondent made to Claimant's cell phone is exhausting. Living through it was undoubtedly far worse. In the first six months of 2016, Claimant continued to pay her bill around the same time each month and Conn's still called her 100 more times. On July 14, 2016, Claimant paid Conn's $67.00. Conn's had already called her 49 times that month, in a span of 9 days, an average of more than 5 calls per day. She paid $67.00 again the next month, on August 12, 2016.  Conn's had already called her 26 times in a span of 6 days.

Claimant continued to pay her bill each month, and each month Conn's continued to use its predictive dialer (an ATDS) to call her anyway:   39 calls in October 2016, 25 calls in November, 20 more calls in a span of only four days in December 2016.

**January 11, 2017:**   By January 11, 2017, Claimant couldn't take it anymore. She had already received 33 autodialer calls from Conn's in less than 6 days that month. She had received more than 370 autodialer calls from Conn's in total. Claimant called Conn's and spoke to Agent Angelina Romero. She told Agent Romero, "Look, y'all call my phone 50 times a day. It's ridiculous. … I ain't never missed a payment. Y'all are going to get your money. But y'all harass me. It's harassment. It's ridiculous how y'all call a person's phone.  … I think I'm gonna find me an attorney, because this is harassment. Just to show how many times y'all call my phone over $67."  Agent Romero entered a note into Claimant's account acknowledging her complaint about the calls: "[unidentified caller stated] that we keep calling and [hung up]."

**January 11, 2017 (the second time):**   Conn's called Claimant again *that same day*. Claimant called Conn's back. This time she spoke to Conn's agent Mercedes Johnson. Her disbelief evident in her voice, Claimant said "Y'all just called my phone again! I have never missed a payment."  She told Agent Johnson again, for the second time that day, that they were harassing her and again, that she was going to get an attorney to stop the harassment. The next day, January 12th, Conn's called her 11 times. She paid her bill on January 13th. Conn's called her 6 times that day. Conn's autodialed Claimant's cell phone 48 times in January 2017, even though she paid her bill the same as she always did, complained about harassment, and threatened to sue Conn's.

The next month, February 2017, Conn's called her 71 times and sent her 3 emails.

**March 13, 2017:**   On March 13, 2017, Claimant spoke to Conn's agent Rheannon Thompson and, again, said she was going to hire an attorney to stop Conn's from harassing her:

> I'm so sick of y'all calling my phone all day long. I'm gonna see what I can do about harassment. I just told them the other day that I'm going to pay it on or before the 15th. […] y'all don't have to call. […] I am gonna get me an attorney. Make sure you put that in the notes, because that's harassment. […] I told them last week the same thing. They called me the other day; I told them the same thing. I'm sick of y'all. […] It's harassment. […] and I'm gonna do something about this.

Agent Thompson entered a note in Claimant's account: "stated I know who she is and she did not want to verify and stated she will file for harassment and [hung up]."

Conn's used its autodialer to place **345 more phone calls** to Claimant after this date. Claimant continued to pay her bill. The calls didn't stop.

| Month | Number of times Conn's called Claimant |
|---|---|
| March 2017 | 42 calls in 9 days |
| April 2017 | 58 calls in 9 days |
| May 2017 | 55 calls in 9 days |
| June 2017 | 60 calls in 10 days |

**June 15, 2017:**   On June 15, 2017, Claimant answered a call from Conn's, and was connected to agent Lonny Soto.  Claimant told Conn's to stop calling her phone: "oooo I get so sick of y'all calling. Please stop calling my phone. I paid my bills last night ok? … Y'all stressing me out. … I wish you make a note of it because you all are really stressing me out." Agent Soto did not make a note of it. He did not remove Claimant from the call list. He did not mark her cell phone number "Do Not Use," (as is supposedly Conn's policy) nor is there any indication in the account notes that Claimant revoked her consent by asking Conn's to stop calling her. In fact, Conn's account notes don't contain anything about the call.

About 90 minutes later, Conn's called Claimant again.

**June 15, 2017 (the second time):**  In her second conversation with Conn's on June 15, 2017, Claimant told Conn's agent Veronica Perez "Stop calling my phone" again. Agent Perez said she would remove Claimant from the call list. She did not. She did not indicate in the account notes that Claimant asked Conn's to stop calling her, or mark her cell phone number as "Do Not Use". Conn's used its autodialer to place **176 more phone calls** to Claimant after this date.

| Month | Number of times Conn's called Claimant |
|---|---|
| July 2017 | 61 calls in 9 days |
| August 2017 | 50 calls in 8 days |
| September 2017 | 18 calls in 9 days |
| October 2017 | 58 calls in 8 days |

**October 11, 2017:**  On October 11, 2017, Claimant told Conn's agent Kerry Brown, "If y'all call my phone one more damn time, I'm gonna sue y'all for harassment" and asked incredulously, "Why are you still calling?"  Agent Brown put in the notes that Claimant stated she is "tired of the calls". Agent Brown did not mention Claimant saying if Conn's called her again she would sue Conn's.

**October 12, 2017:**  On October 12, 2017, Claimant told Conn's agent Angelica Gonzalez, "If you call me one more damn time…" "Stop calling me from all these damn different numbers."  Agent Gonzalez did not enter anything in the account notes about this revocation and she did not mark Claimant's cell phone number as "Do Not Use".

**October 13, 2017:**  On October 13, 2017, Claimant told Conn's agent Joannalois Abbang, "Stop calling me" and "I don't care. Record me. I'm tired of y'all calling me. … Stop calling me. I tell you that every time you call. Ok? Are you recording that? … Stop calling my damn phone." Agent Abbang entered in the account notes that Claimant was upset about the calls

and, finally, changed Claimant's cell number from "Good" to "Do Not Use". Conn's autodialed Claimant two more times that day.

In total, **Conn's autodialed Claimant's cell phone more than 850 times**, and manually dialed Claimant's cell phone more than 50 times, for an average of 35 phone calls per month. See Exhibit A.  For more than two years, nobody in Claimant's life called her more than Conn's.

## III.   Conn's Automatic Telephone Dialing System: Basic Operations of the Noble Outbound Predictive Dialer

Conn's standard financing contract required Claimant to consent to receiving "calls made by an automatic dialing system" because Conn's uses an automatic dialing system to call consumers. If they didn't, they wouldn't need it in the contract.

The automatic telephone dialing system (ATDS) Conn's uses to place outbound calls is the Noble Outbound Predictive Dialer, manufactured by Noble Systems Corporation. Conn's places outbound phone calls 7 days per week, from 8:00 AM to 9:00 PM. On an average day, Conn's places 600,000 outbound phone calls to its customers, and employs approximately 575 agents to handle the phone calls.[2]

That amounts to around 1,044 outbound phone calls per agent, per day, or around 130 phone calls per agent, per hour.  Conn's is able to do this because its human agents do not dial the phone calls. Instead, fittingly, Conn's autodialer dials the phone numbers automatically at a rate many times greater than humanly possible. If the agents had to manually dial the calls instead of having the autodialer do it, they would do well to make 130 calls in *an entire 8-hour shift*.  Conn's ATDS allows it to place a volume and frequency of phone calls that human beings

---

[2] *Williams, Jr. v. Conn Appliances, Inc.*, Case No. 2:17-cv-02052-JTF-cgc (W.D. Tenn. Oct. 9, 2018), (Document 20-3, at p. 69 (Transcript p. 263:13-20).

could never come remotely close to achieving. Conn's autodialer places calls in three modes: manual, broadcast and predictive (or "system assisted").

Manual Mode:  In Manual mode, Conn's agent actually dials the phone number of specific customer and waits to see whether that customer answers. Manual calls do not violate the TCPA because of the significant level human interaction at the time the phone is dialed—i.e., manual calls are not "automatic".

Broadcast Mode:  In Broadcast mode, Conn's predictive dialer places calls using an artificial or prerecorded voice. Conn's makes two types of Broadcast calls:

(1) the predictive dialer plays a prerecorded message such as: "This is Conn's, calling with an important message. Call Conn's today at 1-800-898-7105. You can take advantage of our automated system, or ask to speak with one of our Conn's agents. Call us today before 9:00 P.M. at 1-800-898-7105. Thank you for choosing Conn's."; or

(2) the predictive dialer uses an artificial or prerecorded voice combined with Interactive Voice Response (IVR) software to present the called party with a prompt allowing them to interact with the dialing system, such as a prerecorded greeting, followed by the option to press "1" to speak with a live agent.

Predictive Mode:  A predictive dialer operating in predictive mode can be contrasted with another form of automated dialing equipment, a "progressive" or "preview" dialer. Unlike a predictive dialer, a preview dialer displays the information of a single customer on the agent's screen before the customer's phone is dialed. This ensures that the agent knows who he or she is calling before the call is dialed, and also that the agent will be available to speak to the customer if the call is answered.

Unlike a "preview" dialer, when Conn's ATDS is operating in Predictive or "System Assisted" mode the predictive dialer is dialing from a list of numbers, just as it would in Broadcast mode. However, in Predictive mode, once the dialer system recognizes that a call has been answered, the call is automatically transferred to a live Conn's agent, without any prerecorded message being played. There will often be a brief pause while the call is transferred, and the called party's information is sent to the agent's screen. The first time the agent knows who he or she is speaking with, is when the call is transferred, after the called party has answered the phone. If the predictive dialer does not detect that a call has been answered, it automatically moves on and calls the next number in the list, without any human intervention.  Predictive in this sense means timing. The ATDS is predicting the number of customers that will answer the phone, depending on the number of phone calls placed.

If there are not enough agents to handle all of the answered calls, when the called party answers the phone, there will be silence on the other end, because there is no one to speak with her. This is referred to as an "abandoned" call. On average, Conn's places 18,000 abandoned calls to its customers every day.

As explained above, Manual calls do not violate the TCPA, given the human intervention involved at the time the call is dialed. Claimant only alleges violations for calls Conn's placed to her cell phone in Broadcast or Predictive mode, after Claimant revoked her consent.

## IV.    The Relevant Law and Its Application to the Facts

The relevant section of the TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), provides that:

(1) Prohibitions. It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States –

(A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice –

> (iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States;

Thus, there are two separate types of TCPA violations when calls are made to a consumer's cell phone after she has revoked consent:  (1) calls using an ATDS; and (2) calls using an artificial or pre-recorded voice.   In this case, Respondent committed both types of violations.

### A.   Conn's used a predictive dialer to call Claimant, and a predictive dialer is an ATDS under the TCPA according to the FCC and the overwhelming weight of case law on the issue.

#### 1.   Congress has charged the FCC with rulemaking authority implementing the TCPA—and since 2003, the FCC has repeatedly found that a predictive dialer like the one used by Respondent constitutes an ATDS under the TCPA.

When Congress enacted the TCPA, it vested the Federal Communications Commission (FCC) with the authority to promulgate regulations to implement the Act's requirements. 47 U.S.C. § 227(b)(2).  One way the FCC prescribes such regulations is through declaratory rulings and orders. Thus, a Declaratory Ruling and Order by the FCC carries the force of law. *See Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1121 (11th Cir. 2014) ("Orders 'adopted by the Commission in the avowed exercise of its rule-making power' that 'affect or determine rights generally . . . have the force of law[.]'") (quoting *Columbia Broad. Sys. v. United States*, 316 U.S. 407, 417 (1942)).

The FCC issued such Orders regarding the TCPA in 2003, 2008, 2012 and 2015. As demonstrated below, it is indisputable that since 2003 the FCC has stated that a predictive dialer like the one used by Respondent is an ATDS under the TCPA.

### a.    The 2003 FCC Order

In 2003, the FCC made "short-shrift of the requirement that an ATDS use a random or sequential number generator" by ruling that a system can qualify as an ATDS even if it does not "create and dial 10-digit telephone numbers arbitrarily" but rather "relies on a given set of [phone] numbers." *Maddox v. CBE Group, Inc.*, No. 1:17-CV-1909- SCJ, 2018 WL 2327037, at *4 (N.D. Ga. May 22, 2018) (citing *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14092 (2003) (the "2003 FCC Order")). The 2003 FCC Order noted that "the evolution of the teleservices industry has progressed to the point where using lists of numbers is far more cost effective. The basic function of such equipment, however, has not changed—the capacity to dial numbers without human intervention." *Id*. (emphasis added). Respondent Conn's autodialer dials numbers automatically without human intervention at the time of dialing, and is exactly the type of ATDS to which the 2003 Order was referring.

### b.    The 2008 FCC Order

In 2008, the FCC issued its next order and "affirm[ed] that a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers." *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 23 F.C.C. Rcd. 559, 566 (2008) (the "2008 FCC Order"). The petitioner that prompted the 2008 FCC Order argued, among other things, that (1) the FCC's "determination that predictive dialers fall within the meaning of the statutory definition of 'automated telephone dialing

equipment' was incorrect and conflicts with the language of the TCPA" and (2) the FCC had erred in 2003 because "debt collectors use predictive dialers to call specific numbers provided by established customers." *Id*. at 563, 566. Therefore, the petitioner argued, a predictive dialer should have only met the definition of an ATDS when it randomly or sequentially generated telephone numbers, not when it dialed numbers from customer telephone lists. *Id*. The FCC explicitly rejected that argument. In other words, the FCC reaffirmed that predictive dialers like the one used by Respondent constitute an ATDS under the TCPA.

### c.      The 2012 FCC Order

In 2012, the FCC continued to make clear that the TCPA's definition of an ATDS "covers any equipment that has the specified capacity to generate numbers and <u>dial them without human intervention</u> regardless of whether the numbers called are randomly or sequentially generated or <u>come from calling lists</u>." *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 F.C.C. Rcd. 15391, 15399 (2012) (the "2012 FCC Order"). In short, a system may qualify as an ATDS by simply having "the capacity to dial numbers without human intervention." *Id.* at 15392. The 2012 FCC Order reaffirmed the 2003 and 2008 Orders finding that Respondent's predictive dialer is an ATDS, because it has the capacity to dial numbers without human intervention <u>at the time of dialing</u>.

### d.      The 2015 FCC Order

In 2015, the FCC went further and took the position that a device could also qualify as an ATDS if it had the present, or even the future capacity to dial random and sequential numbers. *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd. 7961, 7974 (2015) (the "2015 FCC Order"). As discussed below, the 2015 FCC Order was appealed.

2.      **The effect of *ACA Int'l* and what courts have said regarding predictive dialers and human intervention since.**

The 2015 FCC Order was challenged in the Courts of Appeal and eventually consolidated before the D.C. Circuit Court of Appeals in *ACA Int'l v. Federal Commc'ns Comm'n*, 885 F.3d 687 (D.C. Cir. 2018).  The *ACA Int'l* court held that the 2015 FCC Order's expansion of what constitutes an ATDS to include devices with the *future* capacity to randomly or sequentially generate numbers created "an eye-popping sweep" that could, with the future addition of software, bring any smartphone within the statutorily enumerated features of an auto-dialer. *Id.* at 696-97.

*ACA Int'l* rejected this interpretation of "capacity" as "an unreasonably, and impermissibly, expansive one." *Id.* at 700. Beyond this, however, courts across the country are not uniform in their opinion of the impact of *ACA Int'l* on the governing standard for what constitutes an ATDS. The majority of Courts – including the only court to address the issue within Tennessee – have found that a predictive dialer remains an ATDS for purposes of the TCPA because there is no human intervention involved at the time of dialing.

At the time of the filing of this brief, in total there have been 33 rulings on this issue post-*ACA-Int'l*: 20 of those rulings found that a predictive dialer is still an ATDS whereas 13 found that a predictive dialer is no longer an ATDS. However, 3 of those 13 decisions[3] are no longer good law after the Ninth Circuit found that a predictive dialer is an ATDS in *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041 (9th Cir. Sept. 20, 2018).  This then brings the "score" to 20 cases finding that a predictive dialer is an ATDS and 10 cases finding that a predictive dialer is not an ATDS – meaning approximately 66% of post-*ACA Int'l* opinions agree with Claimant's

---

[3] Marshall v. CBE Group, Inc., No. 2:16-cv-02406-GMN-NJK, 2018 U.S. Dist. LEXIS 55223 (D. Nev. Mar. 30, 2018); Herrick v. GoDaddy.com LLC, 312 F. Supp. 3d 792 (D. Ariz. May 14, 2018); and Wash. v. Six Continents Hotels, No. 2:16-CV-03719-ODW-JEM, 2018 U.S. Dist. LEXIS 145639 (C.D. Cal. Aug. 24, 2018))

position in the matter at hand: a predictive dialer, like the one used by Respondent, is an ATDS. Claimant has attached a full list of the cases since *ACA Int'l* was issued, reaffirming that a predictive dialer is an ATDS under the TCPA.  See Exhibit B.

When analyzing this issue, the most important opinion in this arbitration is *Ammons v. Ally Fin., Inc.*, 326 F. Supp. 3d 578 (M.D. Tenn. June 27, 2018). The contract between the parties states that the "contract shall be governed by the laws of the State of Tennessee and applicable federal law." Within Tennessee, the issue of whether or not a predictive dialer remains an ATDS after *ACA Int'l* has only been analyzed once and that was by Chief Judge Crenshaw in *Ammons*. It is also important to note that counsel for Respondent, Eric Troutman, Esq., briefed and argued *Ammons* on behalf of the defendant, and Morgan & Morgan represented the plaintiff. There, Chief Judge Crenshaw found that predictive dialers remain ATDSs and that *ACA Int'l* only vacated the 2015 FCC Order, not any of the prior orders. Judge Crenshaw found as follows:

> Accordingly, applying the appropriate standard here, **the primary consideration . . . is "whether human intervention is required at the point in time at which [Ammons'] number [was] dialed."** *Strauss v. CBE Grp., Inc.*, 173 F. Supp. 3d 1302, 1309 (S.D. Fla. 2016). But Ally has made no real argument that a human intermediary acts then. At most, Ally has averred that agents are available to intervene in calls after they have been initiated by the predictive dialer. (See Doc. No. 85 at 18-19). As a matter of common sense, having operators standing by, to use an old phrase, to take a connected call is not "human intervention" in the dialer's *initiation* of calls.

*Id.* at 588.

Respondent uses its Noble Predictive Dialer in two relevant modes: broadcast mode, and predictive mode, which it began calling "system assisted mode" after it began being routinely sued for violating the TCPA. In broadcast mode, Respondent is not even anticipating a customer will answer. Rather, a customer who answers is connected to an automated message, not a live agent. Alternatively, if the customer does not answer, Respondent has the option to leave a pre-

recorded message for the customer. Respondent left several of these messages for the Claimant. In predictive mode, which Respondent will call "system assisted mode", the system dials customers at a 3:1 ratio each time an agent becomes available to answer a call. In both broadcast mode and predictive mode, no human intervention is involved at the time of dialing. Rather, the ten digit telephone number for the customer is dialed by a computer.

Respondent uses this system to place over 600,000 calls per day. If 600 agents log in to their shift in the morning to begin fielding predictive mode calls, the system dials 1,800 customers at once. This is done because Respondent estimates that approximately 1 out of every 3 customers called will answer, thereby increasing agent efficiency as the agents do not have to wait while the phone rings to see if a customer answers. Rather, the system automatically dials multiple numbers for each agent and connects those customers who answer with an available agent. The Noble Predictive Dialer is so automated that **18,000 times per day**, a customer answers a call and there is no agent even available to speak to her. This results in an "abandoned call" where the customer only hears dead air on the other end. This is just one of the negative sides of this type of dialing process, and one of the reasons why the federal government regulates this technology.

> **3.    In 2015, Congress amended the TCPA, and tacitly approved of FCC orders and existing case law deciding that a predictive dialer constitutes an ATDS under the TCPA.**

The importance of Congress' 2015 amendments to the TCPA cannot be overstated.  Most pertinent here, Congress amended 47 U.S.C. § 227(b)(1)(A)(iii) by adding the language in red below:

> (1)  It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States –

(A)    To make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice –

(iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States;

Congress' 2015 amendment to the TCPA speaks volumes, both because of what it says, and because of what it does *not* say.

### a.    Congress did not exclude predictive dialers from the definition of an ATDS under the TCPA.

At the time the 2015 amendment was passed, the FCC had <u>made clear for more than a decade</u> that predictive dialers constitute an ATDS under the TCPA. *See*, the 2003, 2008, 2012 and 2015 FCC Orders.  Importantly, it is well-settled that "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." *Lorillard v. Pons*, 434 U.S. 575, 580 (1978).  In other words, if Congress disagreed with the last 12 years of FCC Orders—if Congress did not want the TCPA to apply to predictive dialers, they would have said so in that 2015 amendment. And they didn't.

### b.    Congress did not exclude dialers that call from lists of numbers from the definition of an ATDS under the TCPA.

Likewise, if Congress disagreed with the last 12 years of FCC Orders that say a dialer can constitute an ATDS even if it calls from a list of numbers, Congress would have said so in that 2015 amendment. And they didn't. In fact, by adding the language "unless such call is made solely to collect a debt owed to or guaranteed by the United States," Congress indicated just the opposite.

All debt collectors call from lists. They don't just call random people. If Congress didn't believe that the TCPA applied to autodialers that call from lists, then there would be no need to make an exception for calls to collect "a debt owed to or guaranteed by the United States."

**B.     The Noble system Respondent used to call Claimant is a predictive dialer.**

It is anticipated that Respondent will deny that the Noble Predictive Dialer is a predictive dialer, and also will allege that the system requires human intervention to operate. Every case that has analyzed and defined a predictive dialer has indicated that the focus is whether or not a human is involved at the time of dialing. *See Ammons*, *supra* ("Accordingly, applying the appropriate standard here, the primary consideration . . . is 'whether human intervention is required at the point in time at which [Ammons'] number [was] dialed.'"). Respondent simply does not have human beings dialing the 600,000 calls it makes each day; rather it calls multiple customers at once and a computer does the dialing.

**1.     Multiple courts have already found Respondents Noble system to be a predictive dialer and therefore an ATDS under the TCPA.**

The best evidence on this issue is that courts who have analyzed the Noble predictive dialer specifically have found that it is a predictive dialer and, therefore, an ATDS under the TCPA.  *See, e.g., Strauss v. CBE Grp., Inc.*, 173 F. Supp. 3d 1302, 1309 (S.D. Fla. 2016) (finding the Noble predictive dialer to be an ATDS); *In re Collecto, Inc.*, No. 14-MD-02513-RGS, 2016 U.S. Dist. LEXIS 16319, at *3 n.1 (D. Mass. Feb. 10, 2016) (finding the Noble predictive dialer with the Maestro software used by Respondent to be an ATDS); *Reyes v. BCA Fin. Servs.*, 312 F. Supp. 3d 1308, 1320 (S.D. Fla. 2018) (finding the Noble predictive dialer to be an ATDS under the TCPA).

"A predictive dialer constitutes an ATDS within the meaning of the TCPA. A predictive dialer is 'hardware, when paired with certain software, [which] has the capacity to store or

produce numbers and dial those numbers at random, in sequential order, or from a database of numbers' without human intervention. To determine whether a dialer is a predictive dialing system, and therefore an ATDS, 'the primary consideration . . . is whether human intervention is required at the point in time at which the number is dialed.'"  *Strauss*, 173 F. Supp. 3d at 1309.

### 2.    Noble refers to its dialing system as a predictive dialer.

Noble advertises its automatic dialer system as an outbound "predictive dialer".  See, e.g., https://www.noblesys.com/wp-content/uploads/2018/ 04/PS_Noble_Outbound.pdf.  Noble holds more than 150 U.S. Patents. Its outbound predictive dialer has a myriad of capabilities that are simply not humanly possible.

### 3.    Conn's itself has publicly and repeatedly stated that it uses a predictive dialer.

The evidence in this case will show that Conn's itself has publicly and repeatedly stated that it uses a predictive dialer.  Respondent has produced the manuals for the Noble Maestro and Noble Harmony software used to operate its Noble predictive dialer. Those manuals refer to "pacing algorithms," "outbound predictive dialing," and "predictive pacing methods."  Conn's own training manual refers to using the Noble dialer for "outbound predictive" call campaigns.

In its publicly filed 2012 SEC Form 10-K, Conn's stated, "We employ Nortel telephone switches and a Noble Systems hosted predictive dialer, as well as a redundant data network and cable plant, to improve the efficiency of our collection and overall corporate communication efforts." Conn's 2013 SEC Form 10-K reiterated, "Our collection activities involve a combination of efforts that take place in our Beaumont and San Antonio, Texas collection centers. We maintain a predictive dialer system, including virtual collection systems, and letter campaigns that help us contact and speak to customers daily."  Conn's still uses that same Noble system it has used since October 2011.

Even more recently, in *Williams, Jr. v. Conn Appliances, Inc.*, Case No. 2:17-cv-02052-JTF-cgc (W.D. Tenn. Oct. 9, 2018), Respondent's Corporate Representative testified under oath that the Noble system codes many of the calls Conn's makes as being made in "predictive mode". *Id.* at (Document 20-3, at p. 66 (Transcript p. 251:19-24)).

In sum, the great weight of evidence and authority shows that Respondent used a predictive dialer to place calls to Claimant's cell phone, and Respondent's predictive dialer is an ATDS under the TCPA.

**C.    Respondent's calls to Claimant in violation of the TCPA were willful or knowing.**

Under the TCPA, if Respondent's violations were found to be "willful or knowing", Claimant is entitled to treble damages of up to $1,500 per call.  The law as to what constitutes a "willful or knowing" violation is not well-settled.  However, "[w]hile neither the TCPA nor FCC regulations provide a definition for willful and knowing, most courts have interpreted the willful or knowing standard to require only that a party's actions were intentional, not that it was aware that it was violating the statute.  *Davis v. Diversified Consultants, Inc.*, 36 F. Supp. 3d 217, 226 (D. Mass. 2014) (citing *Alea London Ltd. v. Am. Home Servs.*, 638 F.3d 768, 776 (11th Cir. 2011) (holding that the TCPA requires mere "knowing" conduct); *Harris v. World Fin. Network Nat. Bank*, 867 F. Supp. 2d 888, 896-97 (E.D. Mich. 2012); *Sengenberger v. Credit Control Servs., Inc.*, 2010 U.S. Dist. LEXIS 43874 (N.D. Ill. May 5, 2010); *Bridgeview Health Care Ctr. Ltd. v. Clark*, 2013 U.S. Dist. LEXIS 37310 (N.D. Ill. Mar. 19, 2013). *But see, e.g., Texas v. Am. Blastfax, Inc.*, 164 F. Supp. 2d 892 (W.D. Tex. 2001) (requiring knowledge that conduct violated the statute)).

1. **Conn's is aware of and understands its obligation to comply with the TCPA.**

Regardless of which standard is applied, Conn's violations are willful or knowing. Conn's understands its obligation to comply with the TCPA.  Conn's SEC filings acknowledge TCPA regulation of their business. *See* SEC filings, *supra*.  Conn's Noble Systems Training Guide includes references to the TCPA, and discusses manual dialing when necessary to comply with the TCPA.

Conn's Training & Development manual has a section titled "Telephone Handling Procedure: Stop Call Request & TCPA Status".  The section begins "**Because of TCPA regulations**, Conn's enacted policies regarding how cell phone numbers are handled on customer accounts."

Conn's has other documents related specifically to the TCPA that were in effect during the relevant time period but that it has failed to produce in this arbitration, including an additional TCPA Job Aid for inbound calls.  Conn's also makes millions of calls using a pre-recorded message, which the TCPA regulates regardless of whether an ATDS is used. The bottom line is, Conn's knows that it is required to comply with the TCPA.

2. **Conn's written policy regarding revocation is not a defense, because Conn's does not actually enforce the policy—Conn's wants to call consumers, regardless of whether they want to be called.**

Conn's will likely argue that its violations are not willful or knowing because it has written policies that require a number be marked "Do Not Use" if a customer asks for calls to stop.  But Conn's written policy defense falls flat, because the evidence shows that in practice, Conn's does not *actually enforce* the policy.  As the court in *Krakauer v. Dish Network L.L.C.*, No. 1:14-CV-333, 2017 U.S. Dist. LEXIS 77163 (M.D.N.C. May 22, 2017) explained:

> Dish maintains that by calling [Plaintiff] in 2010 and 2011, [Dish's vendor] SSN disobeyed direct instructions from Dish. This is true, but it does not disprove willfulness or knowledge.
> […]
> Given the tens of thousands of violative calls SSN made in a span of just over a year, even a cursory investigation or monitoring effort by Dish would have uncovered the violations. Under these circumstances, what Dish calls a mistaken belief is actually willful ignorance.

*Id.* at *31-32. Conn's is one of the most prolific violators of the TCPA in the country. Its agents in this case repeatedly failed to mention in the account notes that Claimant said to stop calling. That is done willfully. Conn's does not *really* want its agents to stop calling, even when customers do not want to be called.

In fact, Conn's Noble dialer uses patented technology to make phone calls that appear to be from different phone numbers with the consumer's same local area code specifically because (1) Conn's does not want the consumer to be able to identify the number as Conn's, because the consumer could ignore or block the number; and (2) a consumer is more likely to answer a call from a phone number she doesn't recognize if it's from a local area code.  It is intentional deceit to try to get people that do not want Conn's calling them to answer the phone.

> **3.    Conn's continued to call Claimant, despite her repeated complaints of harassment, threats to hire a lawyer, and requests that Conn's stop calling her.**

What is clear is that regardless of what Conn's says in its written policy on customers' revoking consent, in practice, the policy is not enforced. Even after Claimant threatened to hire an attorney to stop Conn's harassing phone calls on March 13, 2017, Conn's continued to ignore its written policy:

- June 15, 2017
    - Claimant told Conn's agent Lonny Soto to stop calling her phone.
    - Agent Soto did not mark Claimant's cell phone "Do Not Use"

- o There is no indication in the account notes that Claimant asked Conn's to stop calling her.

- ▪ June 15, 2017 (Second Revocation)
  - o Claimant told Conn's agent Veronica Perez to stop calling her phone.
  - o Agent Perez did not remove Claimant from the call list.
  - o Agent Perez did not mark Claimant's cell phone number "Do Not Use"
  - o There is no indication in the account notes that Claimant asked Conn's to stop calling her.

- ▪ October 11, 2017
  - o Claimant told Conn's agent Kerry Brown, "If y'all call my phone one more damn time, I'm gonna sue y'all for harassment" and "Why are you still calling?"
  - o Agent Brown put in the notes that Claimant stated she is "tired of the calls".
  - o Agent Brown did not mention Claimant saying if Conn's called her again she would sue Conn's.

- ▪ October 12, 2017
  - o Claimant told Conn's agent Angelica Gonzalez, "Stop calling me from all these damn different numbers."
  - o Agent Gonzalez did not enter anything in the account notes about this revocation either.

The agents did not document Claimant's revocations or mark her number "Do Not Use" because regardless of what its written policy says, in reality, Conn's doesn't want them to. This is not an outlier incident, or a series of rogue agents. It is a business decision to pressure individuals into paying. Conn's has been in possession of the above-described conversations during the entire course of its conduct, yet still failed to comply with the law.[4] Moreover, every single defense raised by Respondent wasn't available during the time period of the illegal harassing calls. It is truly willful and knowing when there is no defense to the conduct. Conn's wants agents to keep calling. It trains them to keep calling. It uses technology to trick customers into answering, and to prevent them from blocking Conn's number. Conn's willfully and knowingly violates the TCPA as a matter of policy and is not hoping to raise meritless defenses after the fact in order to salvage its unlawful activity. Therefore, treble damages are appropriate.

---

[4] Transcripts of the conversations are attached as Exhibit C.

## V.   <u>Conclusion</u>

As has been demonstrated, Claimant is entitled to an award of $172,500 based on the TCPA's minimum statutory damages of $500 per call for the 345 autodialer calls after March 13, 2017. However, it is clear from the egregious pattern of behavior displayed by Respondent that this was a willful and knowing campaign of harassment for the 176 autodialer calls placed after Claimant revoked twice again on June 15, 2017 (having previously complained about harassment and threatened to hire an attorney on at least 3 occasions prior to that date), thereby entitling the Claimant to treble damages of $1,500 per call for those calls, for a total award in the amount of $348,500.

Respectfully submitted,

/s Joshua R. Kersey
Joshua R. Kersey
Octavio Gomez
Frank H. Kerney, III
MORGAN & MORGAN, PA
201 North Franklin Street, 7th Floor
Tampa, Florida 33602
Phone: (813) 225-5505
Fax:  (813) 222-2490
JKersey@ForThePeople.com
TGomez@ForThePeople.com
FKerney@ForThePeople.com
JessicaK@ForThePeople.com

Counsel for Claimant

# EXHIBIT A

## NUMBER OF AUTODIALER CALLS CONN'S MADE TO CLAIMANT'S CELL PHONE EACH MONTH

| Month/Year | # of Dialer Calls |
|---|---|
| September 2015 | 16 |
| October 2015 | 9 |
| November 2015 | 30 |
| December 2015 | 18 |
| January 2016 | 7 |
| February 2016 | 20 |
| March 2016 | 14 |
| April 2016 | 19 |
| May 2016 | 23 |
| June 2016 | 16 |
| July 2016 | 49 |
| August 2016 | 25 |
| September 2016 | 12 |
| October 2016 | 39 |
| November 2016 | 25 |
| December 2016 | 20 |
| January 2017 | 48 |
| February 2017 | 63 |
| March 2017 | 42 |
| April 2017 | 58 |
| May 2017 | 55 |
| June 2017 | 60 |
| July 2017 | 61 |
| August 2017 | 50 |
| September 2017 | 18 |
| October 2017 | 58 |
| **TOTAL:** | **855** |

# EXHIBIT B

## Post-*ACA International* Opinions

**Equipment that dials from a list of numbers automatically, with no human intervention <u>at the time of dialing</u> is still an ATDS:**

|    | CASE | JURISDICTION |
|----|------|--------------|
| 1  | Wilson v. Quest Diagnostics | D.N.J. Dec. 18, 2018 |
| 2  | Maes v. Charter | W.D. Wisc. Oct. 30, 2018 |
| 3  | Adams v. Ocwen | S.D. Fla. Oct. 26, 2018 |
| 4  | Keifer v. Hosopo Corp. | S.D. Cal. Oct. 25, 2018 |
| 5  | Glasser v. Hilton Grand Vacations Co. | M.D. Fla. Sep. 24, 2018 |
| 6  | Marks v. Crunch San Diego, LLC | 9th Cir. Sept. 20, 2018 |
| 7  | Heard v. Nationstar Mortg. LLC | N.D. Ala. Aug. 23, 2018 |
| 8  | Ramos v. Hopele of Fort Lauderdale | S.D. Fla. Aug. 16, 2018 |
| 9  | Abante Rooter and Plumbing, Inc. v. Alarm Co. | N.D. Cal. Aug. 3, 2018 |
| 10 | Somogyi v. Freedom Mortg. Corp. | D.N.J. Aug 2, 2018 |
| 11 | Sieleman v. Freedom Mortg. Corp. | D.N.J. Aug. 2, 2018 |
| 12 | Pieterson, et al. v. Wells Fargo Bank, N.A. | N.D. Cal. July 2, 2018 |
| 13 | O'Shea v. Am. Solar Sol. | S.D. Cal. July 2, 2018 |
| 14 | Ammons v. Ally Fin., Inc. | M.D. Tenn. June 27, 2018 |
| 15 | Dominguez v. Yahoo, Inc. | 3rd Cir. Jun. 26, 2018 |
| 16 | McMillion v. Rash Curtis & Associates | N.D. Cal., June 18, 2018 |
| 17 | Swaney v. Regions Bank | N.D. Ala. May 22, 2018 |
| 18 | Maddox v. CBE Grp., Inc. | N.D. Ga. May 22, 2018 |
| 19 | Reyes v. BCA Fin. Servs., Inc. | S.D. Fla. May 14, 2018 |
| 20 | France v. DiTech Fin., LLC | M.D. Fla. Apr. 6, 2018 |

**Equipment that dials from a list of numbers automatically, with no human intervention <u>at the time of dialing</u> is no longer an ATDS:**

|    | CASE | JURISDICTION |
|----|------|--------------|
| 1  | Harbach v. USAA Federal Savings Bank | N.D. Iowa Jan. 9, 2019 |
| 2  | Richardson v. Verde Energy USA, Inc. | E.D. Pa. Dec. 14, 2018 |
| 3  | Johnson v. Yahoo!, Inc. | N.D. Ill. Nov. 29, 2018 |
| 4  | Roark v. Credit One Banks, N.A. | D. Minn. Nov. 13, 2018 |
| 5  | Fleming v. Associated Credit Credit Servs., Inc. | D.N.J. Sept. 21, 2018 |
| 6  | Gonzalez v. Ocwen Loan Servicing, LLC | M.D. Fla. Sept. 5, 2018 |
| 7  | Keyes v. Ocwen Loan Servicing | E.D. Mich. Aug. 16, 2018 |
| 8  | Gary v. TrueBlue, Inc. | E.D. Mich. Aug. 1, 2018 |
| 9  | Pinkus v. Sirius XM Radio, Inc. | N.D. Ill. July 26, 2018 |
| 10 | Sessions v. Barclays Bank Delaware | N.D. Ga. June 25, 2018 |

1. *Wilson v. Quest Diagnostics,* No. 2:18-11960, 2018 U.S. Dist. LEXIS 212023 (D.N.J. Dec. 18, 2018) (This Court finds the Third Circuit's interpretation of the TCPA "as we did prior to the issuance of the 2015 [order]" to mean that the D.C. Circuit did not invalidate the 2003 and 2008 Orders, only the 2015 Order. See Id.    Therefore, a predictive dialer qualifies as an ATDS so long as it has "the [present] capacity to dial numbers without human intervention." 2003 Order at 14092 (alteration to reflect precedent);

2. *Maes v. Charter*, No. 18-cv-00124, 2018 WL 5619199 (W.D. Wisc. Oct. 30, 2018) ( "the court  concludes the 2003 FCC order is still valid".) (What *ACA International* did was to reject the FCC's have-your-cake-and-eat-it-too approach to the questions before it . . . but what *ACA International* did not do is endorse one interpretation over the other, even implicitly.  It overstates the holding of ACA International when it says that the "D.C. Circuit overturned the FCC's decision in the 2015 Declaratory Ruling to 'reaffirm[] . . . the notion that a device can be considered an autodialer even if it has no capacity itself to generate random or sequential numbers […]);

3. *Adams v. Ocwen*, No. 18-81028, 2018 U.S. Dist. LEXIS 184513 (S.D. Fla. Oct. 26, 2018) (The Court agrees with the reasoning and conclusions of post-*ACA* decisions which hold that "the statutory definition of ATDS includes a device that stores telephone numbers to be called, **whether or not** those numbers have been generated by a random or sequential number generator.);

4. *Keifer v. Hosopo Corp*., No. 3:18-cv-1353, 2018 U.S. Dist. LEXIS 183468 (S.D. Cal. Oct. 25, 2018) ("…an ATDS need not create or develop the numbers dialed on its own.");

5. *Glasser v. Hilton Grand Vacations Co.*, No. 8:16-cv-952-JDW-AAS, 2018 U.S. Dist. LEXIS 162867(M.D. Fla. Sep. 24, 2018) (*ACA Int'l* left intact earlier FCC rulings that the basic function of an auto-dialer is to dial numbers without human intervention);

6. *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041 (9th Cir. Sep. 20, 2018) (Statutory definition of ATDS includes devices that stores telephone numbers to be called, whether or not those numbers have been generated by a random or sequential number generator, including predictive dialers);

7. *Heard v. Nationstar Mortg. LLC*, No. 2:16-cv-00694-MHH, 2018 U.S. Dist. LEXIS 143175 (N.D. Ala. Aug. 23, 2018) (Predictive dialer meets the statutory definition of an ATDS);

8. *Ramos v. Hopele of Fort Lauderdale*, No. 17-62100-CIVMORENO/SELTZER, 2018 U.S. Dist. LEXIS 139947 (S.D. Fla. Aug. 16, 2018) ("human intervention" test from FCC's 2003 predictive dialer rulings survived *ACA Int'l*);

9. *Abante Rooter and Plumbing, Inc. v. Alarm.Com*, No. 15-cv-06314, 2018 WL 3707283 (N.D. Cal. Aug. 3, 2018) ("*ACA International* invalidated *only* the 2015 FCC Order") (Emphasis added);

10. *Somogyi v. Freedom Mortg. Corp.*, No. 17-6546 (JBS/SJ), 2018 U.S. Dist. LEXIS 12697 (D.N.J. Aug 2, 2018) (predictive dialer rulings survived *ACA Int'l* and dialing from a list is "random or sequential" dialing);

11. *Sieleman v. Freedom Mortg. Corp.*, No. 17-13110 (JBS/JS), 2018 U.S. Dist. LEXIS 129698 (D.N.J. Aug. 2, 2018) (predictive dialer rulings survived *ACA Int'l* and dialing from a list is "random or sequential" dialing);

12. *Pieterson, et al. v. Wells Fargo Bank, N.A.*, No. 17-cv-02306-EDL, 2018 U.S. Dist. LEXIS 113125 (N.D. Cal. July 2, 2018) (Denying motion to stay noting that while "*ACA International* vacated the 2015 Declaratory Ruling, it did not clearly intend to disturb the FCC's 2003 and 2008 Orders");

13. *O'Shea v. Am. Solar Sol.*, No. 3:14-cv-00894-LRBB, 2018 U.S. Dist. LEXIS 110402 (S.D. Cal. July 2, 2018) (following *Swaney* and holding that FCC's predictive dialer rulings survived *ACA Int'l*.) (The *ACA* decision left intact the holding of both the FCC's 2003 and 2008 Order that an autodialer is an ATDS.  It follows that the ViciDial predictive dialer is an ATDS.");

14. *Ammons v. Ally Financial*, 326 F. Supp. 3d 578 (M.D. Tenn. June 27, 2018) (Predictive dialer rulings survived *ACA Int'l*.)  (The District Court determined that "beyond not expressly repudiating the 2003 FCC Ruling, 2008 FCC Ruling, and 2012 Ruling, as discussed above, *ACA International* supports the conclusion reached in *Reyes* because the D.C. Circuit explicitly acknowledged the FCC's 2003 determination that 'while some predictive dialers cannot be programmed to generate random or sequential phone numbers, they still satisfy the statutory definition of an ATDS.'"  *Id*., at *12-13.  The District Court went on to note that "applying the appropriate standard here, the primary consideration…is 'whether human intervention is required <u>at the point in time at which [the Plaintiff's] number [was] dialed</u>.");

15. *Dominguez v. Yahoo, Inc.,* 894 F.3d 116 (3rd Cir. Jun. 2018) (text message case finding that the 2003, 2008, and 2012 FCC Orders on predictive dialers remain intact);

16. *McMillion v. Rash Curtis & Associates*, No. 16-cv-03396-YGR, 2018 U.S. Dist. LEXIS 101700 (N.D. Cal., June 18, 2018)(*ACA Int'l* did not disturb prior Ninth Circuit rulings on predictive dialers.) (The Defendant argued that its dialing systems were not an ATDS because they "could not store or produce phone numbers to be called using a random or sequential number generator" as outlined in the statutory language. *Id*. at *4. The District Court found that "*ACA International* invalidated only the 2015 FCC Order" noting that "the court discussed but does not rule on the validity of the 2003 FCC Order or the 2008 FCC Order." *Id*. at *7. Accordingly, the District Court upheld its previous ruling that the Defendant's dialing systems were an ATDS because they "possessed 'predictive dialing' capabilities which allowed them to operate without human intervention" *Id*. at *4. Similarly here, there is no question that Respondent's dialing system can operate without human intervention **at the time of dialing** and is therefore a predictive dialer subject to the TCPA);

17. *Swaney v. Regions Bank*, No. 2:13-cv-00544-JHE, 2018 U.S. Dist. LEXIS 85217 (N.D. Ala. May 22, 2018) (2003 FCC predictive dialer ruling remains binding.) (Ultimately, the District Court found that the plaintiff was "entitled to partial summary judgment on the issue of whether the Defendant's system is an ATDS under the TCPA" because the Plaintiff "presented sufficient evidence to demonstrate that the system at issue has the capacity to dial numbers without human intervention." *Id*., at *3. Similarly here, Claimant is not contending that Respondent violated the TCPA by using a system that can generate random or sequential numbers. Rather, Respondent utilized a predictive dialer, which dialed numbers from a list randomly or sequentially without human intervention at the time of dialing and is an ATDS for purposes of the TCPA pursuant to the 2003 and 2008 FCC Orders.);

18. *Maddox v. CBE Grp., Inc*., No. 1:17-cv-1909-SCJ, 2018 WL 2327037 (N.D. Ga. May 22, 2018) ("human intervention" test from FCC's 2003 predictive dialer rulings survived *ACA Int'l*);

19. *Reyes v. BCA Fin. Servs., Inc.,*. 312 F. Supp. 3d 1308 (S.D. Fla. May 14, 2018)(*ACA Int'l* did not overrule FCC's predictive dialer rulings so they remain binding.) (In its Order on Summary Judgment, the District Court specifically held that "the prior FCC Orders are still binding" and that the Noble predictive dialer is an ATDS, regardless of how the numbers it dials are loaded into the dialing system, because it automatically dials these telephone numbers without human intervention at the time of dialing. *Id.*, at *23-25. The Court went on to observe that *ACA Int'l* does not endorse one interpretation other the other and, absent an express rejection of the prior FCC Orders, the Court cannot deviate from them and impose its own interpretation of the TCPA. The court notes "the FCC has

consistently held that predictive dialers constitute ATDSs, their basic function being that **they can dial persons without human intervention** regardless of whether called numbers are generated randomly or sequentially or from a list. Part of the concession of a predictive dialer by Defendant is there is no human intervention **<u>at the time of dialing</u>**." (emphasis added). *Id*., at \*10.  Notably, the Noble predictive dialer is the same dialing system utilized by Respondent for all the actionable calls placed to Claimant's cell phone without his consent.);

20. *France v. DiTech Fin., LLC*, No. 8:17-cv-3038-T-24 MAP, 2018 WL 1695405, at \*8 (M.D. Fla., Apr. 6, 2018).  (The Defendant moved to dismiss the Plaintiff's claim in part because Plaintiff allegedly failed to set forth "sufficient facts to support their contention that Defendant used an ATDS" and cited to the statutory language regarding random or sequential number generation.  *Id.*, at \*7-8.  However, the District Court was not persuaded and rejected the Defendant's argument on this issue noting that "Plaintiffs' allegations are consistent with the use of a predictive dialer." *Id*., at \*8.  As such, it is clear from this finding that the District Court continues to hold that a predictive dialer remained an ATDS  following *ACA Int'l*.).