## AMERICAN ARBITRATION ASSOCIATION

VERONICA DAVIS,

    Claimant,

vs.                                                                                                                                           Case No. 01-17-0006-8007

CONN APPLIANCES, INC.,

    Respondent.

### CLAIMANT'S POST-HEARING BRIEF

As prefaced in Claimant's Pre-Hearing Brief, the facts of this case are straightforward. Claimant went to Conn's in August 2015 to purchase a couch and a love seat for her home. She spoke to a Sales Representative in the store when purchasing the furniture. Claimant explained her financial situation, that is, she uses her first paycheck of the month to pay her mortgage, so she would not be able to make the payment to Conn's until she received her second paycheck around the 15th of each month. (Tr. 148:1-7). The Sales Representative told Claimant she would be fine, so long as she paid on or before the 15th of each month. (Tr. 148:1-7; 344:18-345:14).[1] The payment coupon booklet Conn's provided Claimant said the same thing. (Tr. 148:1-7; 339:4-340:5).

What Conn's did not explain to Claimant is that she would receive up to 14 phone calls a day from the 6th until she made her payment, even if she paid on or before the 15th. Had Claimant known this, it's likely she would not have shopped at Conn's. (Tr. 306:25-307:2) (In a September 8, 2015 phone call, Claimant told Conn's agent, "[W]hen I pay this off, that's it. I'm done with y'all. Y'all – I ain't never in my life been harassed like this.").

---

[1] Conn's Sales Representatives are paid on commission and therefore have added incentive to make sales. (Tr. 31:12-14).

1

In the hearing, we heard Conn's Senior Manager of Compliance, Clint Walton, say repeatedly that the calls were to "inform" and "educate" Claimant about her payments. (Tr. 40:21-22; 41:16-29, 22-25; 460:9-12). What we did not hear is any phone call where Claimant gave any indication there was anything about the payment that she did not know or understand. If she paid on or before the 15th, there was no late fee. That was the deal.

We also heard Conn's Senior Manager of Compliance repeatedly testify that each of these calls with an agent should be viewed in a "vacuum". (Tr. 185:1,5,16; 241:7,12; 315:7-316:17). This is yet another reason why this technology is regulated. It's not a vacuum for Ms. Davis. She had to deal with it every time the phone rang. She had to have the same futile conversation with Conn's agents over and over. If human beings had to make these calls they would not be made, because it would be an unjustifiable, senseless waste of everybody's time. But using a computer program to make the calls takes the humanity out of it. What we see in this case is an abusive use of an automated technology, which Conn's has adopted as a means to cut costs and harass consumers in order to get them to make payment as soon as possible.

## APPLICATION OF THE LAW TO THE FACTS

**1. Claimant had a right to revoke her consent.**

The Arbitrator has already ruled on this issue. Claimant had a right to revoke her consent by any reasonable means, including verbally.

**2. Conn's dialer is an ATDS because it does not involve human intervention at the time of dialing.**

Claimant anticipates Conn's will argue it does not use an ATDS because its dialer allegedly is "not relying on those types of algorithms that are discussed within predictive senses." (Tr. 301:7-10). It does not matter. Respondent argued that unlike the dialer used by Ally Financial, Inc. in *Ammons v. Ally Fin., Inc.*, 326 F. Supp. 3d 578 (M.D. Tenn. June 27,

2018), which was a predictive dialer, the dialer Conn's uses is not a predictive dialer, therefore *Ammons* doesn't apply. That is not true. *Ammons* states:

> Accordingly, applying the appropriate standard here, **the primary consideration . . . is "whether human intervention is required at the point in time at which [Ammons'] number [was] dialed."** *Strauss v. CBE Grp., Inc.*, 173 F. Supp. 3d 1302, 1309 (S.D. Fla. 2016). But Ally has made no real argument that a human intermediary acts then. At most, Ally has averred that agents are available to intervene in calls after they have been initiated by the predictive dialer.[10] (See Doc. No. 85 at 18-19). As a matter of common sense, having operators standing by, to use an old phrase, to take a connected call is not "human intervention" in the dialer's *initiation* of calls.

*Id.* at 588. But just as important is what the court said at footnote 10, when discussing Ally's contention that it did not use a predictive dialer:

> In the end, however, it does not matter, because Ally concedes in its brief that agents are only "available to field" calls *after* they are made.

It does not matter whether the ATDS uses a predictive algorithm or not. That is not the standard *Ammons*, or the majority of courts across the nation, have applied. What matters is whether there is human intervention in the dialer's initiation of the call.

On an average day: Conn's has 300,000-330,000 customers that are at least one day past due. (Tr. 43:1-3). Conn's makes "a little bit over two call attempts per day for each customer that's past due." (Tr. 43:22-24). Conn's has roughly 490 agents available to take calls. (Tr. 86:4-14). Only 10-15% of the calls are answered. (Tr. 298:18-19).

Taking those averages: if we round down to 2 calls each day, on each of 315,000 accounts. That's 630,000 phone calls for 490 agents—or 1,286 calls per agent. 12.5% of calls are answered—so 87.5% are not. 87.5% of 630,000 is 551,250. That means on an average day Conn's autodialer dials more than 550,000 phone calls that are not answered. No human being dials the phone numbers. No human being clicks anything for each of the calls. So when Conn's representative inferred that an agent is specifically clicking a button every time a call is

3

launched, that is not true. The agent does not even select which customer to call. The agents are simply "standing by" and available to field calls *after* the customer has answered. Conn's ATDS is *exactly* the type of system being described in *Ammons*.

3.  **Revocation of Consent[2]**

The FCC has ordered that Consumers "may revoke consent in any manner that clearly expresses a desire not to receive further messages." *In re Rules & Regulations Implementing the TCP Act of 1991 et al.*, 30 FCC Rcd 7961, 7996, 2015 FCC LEXIS 1586, *108, 62 Comm. Reg. (P & F) 1539 (F.C.C. July 10, 2015) (the "2015 FCC Order"). The FCC goes on to explain:

> When assessing whether any particular means of revocation used by a consumer was reasonable, we will look to the totality of the facts and circumstances surrounding that specific situation, including, for example, whether the consumer had a reasonable expectation that he or she could effectively communicate his or her request for revocation to the caller in that circumstance, and whether the caller could have implemented mechanisms to effectuate a requested revocation without incurring undue burdens. We caution that callers may not deliberately design systems or operations in ways that make it difficult or impossible to effectuate revocations.

*Id.* at fn. 233. Because revocation is a factual issue rather than a legal issue there is a lack of court opinions deciding whether certain words or phrases are sufficient to revoke consent—it is a question for the jury. In trying to provide additional guidance, a few courts have looked to the Restatement 2d of Torts which states:

> The consent is terminated when the actor knows or has reason to know that the other is no longer willing for him to continue the particular conduct. This unwillingness may be manifested to the actor by any words or conduct inconsistent with continued consent or it may be apparent from the terms of the original consent itself, as when a specified time limit expires.

Restat 2d of Torts, § 892A (2nd 1979); *see also Jara v. GC Servs.*, No. 2:17-cv-04598-ODW-RAO, 2018 U.S. Dist. LEXIS 83522, at *9 (C.D. Cal. May 17, 2018) ("[C]onsent is terminated

---

[2] For the arbitrator's ease of reference, Claimant has attached a composite **Exhibit 1**, which contains the portion of the final hearing transcript for each of the phone calls at issue.

when the [person who obtained consent] knows or has reason to know that the other is no longer willing for him to continue the particular conduct." *Dixon v. Monterey Fin. Servs., Inc.*, No. 15-cv-03298-MMC, 2016 U.S. Dist. LEXIS 82601, 2016 WL 3456680, at *3 (N.D. Cal. June 24, 2016) (quoting *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1256 (11th Cir. 2014))).

Because the issue of whether a called party revoked consent is a question of fact for the jury, when courts address the issue it is almost exclusively to determine whether a question of fact exists to go to the jury. Nearly all of the case law regarding revocation of consent consists of orders on motions for summary judgment—that is, defendants move for summary judgment arguing a plaintiff did not revoke consent, and the court decides whether there is a sufficient factual dispute as to whether plaintiff revoked consent. If summary judgment is denied, the cases settle, and there is no jury determination. *See e.g., Ammons*. There might be case law in a situation where one party appealed the jury's determination as to consent, but Claimant is not able to find a decision where a jury's verdict as to whether a consumer revoked consent was appealed.

In addition, many of these cases are arbitrated due to the prevalence of arbitration clauses in consumer contracts. In arbitration it is of course the arbitrator that plays the dual role of judge and jury. Because arbitration awards are not reported in the same manner as district court cases, Claimant is extremely limited in her ability to research arbitration decisions on this issue. However, in *Fred Summers v. Conn Appliances, Inc.*, AAA Case No. 01-16-0004-1183 (January 10, 2018), the following language was found to be a revocation of consent:

> Y'all keep calling me. I told you repeatedly when I would make that payment, and you keep on calling me. I am in the middle of church service right now. Just, uh -- I give you two -- two -- I get 250 minutes per month. I'm over 200 minutes on wasting phone calls. So any more, and I will contact my attorney, and they will be in contact with you. Now, I told you when the money would be

5

> there. I made a payment the other day. If that is not good enough, I don't know what is, but my attorney will get in touch with you in the morning. Good-bye.

The language of the revocation in *Summers* is remarkably similar to the language of Claimant's March 13, 2017 conversation with Respondent's agent in this case:

> Yes. Y'all – I'm so sick of y'all calling my phone all day long. I'm going to see what I can do about harassment. I just told them the other day that I'm going to pay on or before the 15th. I know when it was late fee going to apply. I know when the late fee is going to apply. Y'all don't have to call. Y'all done call my phone 30 times this morning. I'm going to get me an attorney. Make sure you put that in the notes because that's harassment. And I've done already told them last week the same thing. They called me the other day, I told them the same thing. I'm sick of y'all.

(Tr. 392:5-16). Claimant finished the call by saying "It's harassment and I'm going to do something about this." (Tr. 392:24-25). In *Summers*, Respondent's agent noted the account following the aforementioned conversation as follows: "Cust stated that we need to stop calling him. He stated he will call his lawyer in the morning then hung up." Whereas in this case, the agent noted Claimant's account, "Stated I know who she is did not want to verify and stated she will file for harassment and [hung up]."

As Conn's Corporate Representative conceded there are no magic words or phrases a customer must use in order to revoke consent. (Tr. 225:4-6). The question is simply whether Claimant clearly expressed a desire not to receive further calls; whether Conn's had reason to know that Claimant was no longer willing for it to continue calling her. On March 13, 2017, Claimant told Conn's 1) she was sick of them calling, 2) she was going to see what she could do about harassment, 3) that she knew when the late fee was going to apply and they didn't have to call, 4) that she was going to get an attorney, 5) that it was harassment, and 6) that she was going

6

to do something about it. No reasonable person would think that Claimant wanted Conn's to continue calling her.

When considering revocation, the FCC requires that we "look to the totality of the facts and circumstances surrounding that specific situation." 2015 FCC Order at fn. 233. By the time of the March 13, 2017 call, Claimant had received several hundred phone calls from Respondent. Claimant already had numerous conversations with Conn's where she repeatedly told them she understood the situation, and that they were harassing her. By the time of the March 13, 2017 call, Claimant had already told Conn's twice before, in January 2017, that she was going to get an attorney (see Tr. 183:1-4 "I think I'm going to find me an attorney because this is harassment"; and 188:16-18 "I'm just informing y'all well – I'm going to have to get me an attorney. Okay. This is harassment. I ain't never missed a payment."). Claimant testified that the reason she said that to the agents in January was "Just – just trying to threaten them, hoping that they would stop maybe." (Tr. 422:1-2). No reasonable person considering the totality of the circumstances would think that Claimant repeatedly complained about the phone calls and threatened to sue Conn's three times because she wanted Conn's to continue calling her.

Claimant revoked consent many more times, including on May 9, 2017, June 15, 2017, June 15, 2017 (again the same day), July 13, 2017, October 11, 2017, October 12, 2017 and October 13, 2017. Claimant's position with respect to these revocations is summarized in **Exhibit 2** for the arbitrator's ease of reference.

2. **Re-Consent**

Claimant anticipates Conn's will argue that even if she revoked consent, she subsequently provided express consent again, therefore allowing Conn's to use its ATDS to call her. One argument Conn's has made is that Claimant provided express consent on March 14,

7

2017, by virtue of placing a phone call to Conn's in order to obtain the phone number for the IVR system so she could make her payment. (Tr. 459:18-23). The basis of Conn's argument is a clause in its retail sales agreement that states "For each telephone number you provide to seller (either directly or by placing a call to us) you consent and authorize us to place telephone calls to you at that number." There are a variety of reasons that argument fails, but the easiest way to dispose of it is that Claimant's March 14th call was not made from her cell phone number ▮▮▮▮. It was made from ▮▮▮▮. (Tr. Ex. 2 at CONN-VDAVIS000031)("ANI" means "Automatic Number Identification" or Caller ID).

Claimant anticipates Conn's will argue that she granted express consent on other occasions as well—that she actually wanted Conn's to keep calling to inform and educate her. Conn's will point to transcript entries where Claimant states "y'all can keep calling". But as Conn's Senior Manager of Compliance testified, "we have to view the call in its entirety." (Tr. 194:13-14). It is clear from the recordings that Claimant does not want to be called. Instead, Claimant is trying to convey to Conn's that they cannot harass her into doing what they say. The fact that Conn's Senior Manager of Compliance, who helped draft the policies and procedures agents follow regarding TCPA compliance, testified that Claimant never revoked her consent shows that Respondent has made a conscious decision as a corporation to ignore the TCPA's restrictions and instead bombard consumers with unwanted and harassing calls in an effort to pressure those customers into making payments as soon as possible.

From before she even bought the furniture, Conn's told Claimant she would be fine so long as she paid on or before the 15th. That was the deal. Claimant had already explained to Conn's repeatedly that she understood they were saying her payment was "due" on the 5th, but that she could pay it on or before the 15th without a late fee. That was the deal from the

8

beginning. That was also what the payment booklet Conn's gave Claimant said. (Tr. 148:1-7). The line in the payment booklet that states the late charge says "Late After _____" and then has a date which, in this case, was the 15th. (Tr. 339:13-340:4). There is no phone call where it appears that Claimant has forgotten that.

Conn's was calling Claimant up to 14 times a day telling her she is late, when the payment booklet Conn's gave her says she is not late until after the 15th, which is the same thing that the sales agent in the store told her. It is clear from the recordings that Claimant views Conn's phone calls as harassment in order to try to pressure her into paying Conn's earlier than they said she had to. *See e.g.,* (Tr. 254:2-6) ("But my bill ain't even due. You're going to get it when I pay it. Y'all just keep calling. I done told y'all, y'all aren't going to make me do no more than I'm going to do. Okay?"). No reasonable person would listen to the recordings and think Claimant was telling Conn's to keep calling her. It's clear that Conn's was trying to exhaust Claimant's will, and Claimant was trying to let Conn's know that she would not succumb to their harassment; that they would not break her.

Conn's argument is disingenuous for several reasons. First, the law requires **express** consent. In the calls where Conn's alleges Claimant re-consented to receiving autodialer calls, she also complains about the calls and states they are harassing. Viewing the entire calls and the totality of the circumstances, as required by the FCC, any alleged re-consent certainly wasn't express. In addition, Conn's own policies (properly) require *express* consent to receive calls using an autodialer or pre-recorded messages. *See* Tr. Ex. 5:

And Conn's Senior Manager of Compliance testified at the final hearing that agents are supposed to ask customers to verify that they consent to receive autodialer calls or prerecorded messages "when a customer has made changes or introduced a new phone to the relationship[.]" (Tr. 101:18-22).

Moreover, a review of the calls in conjunction with the account notes shows that Conn's *own agents* understand that Claimant did not want to be called. For instance, during a call on May 9, 2017, part of what Claimant says is "keep calling, that's fine with me." But when listening to the recording it's clear that Claimant is upset about the calls. That is why Conn's agent responds "Well what day can we set you up [to pay]? **That way I can stop these calls for you.**"[3] It was clear to the agent that Claimant wanted the calls to stop. But he did not mark her number "do not use." Instead, Conn's called Claimant 11 times the very next day.

Similarly, in a call on August 9, 2017, Claimant said:

> You know what? Y'all call every month. You can keep calling. You're not going to get your money until I pay it. Okay? I pay it every month around the same time. No late fees. Okay? Y'all is stressing me out. Y'all getting on my nerves.

(Tr. 264:4-9). Again, despite that Claimant said "You can keep calling" it was clear to Conn's agent that Claimant did not want to be called; she notated the account "stated she would make [payment] when she could; **upset about the calls.**" (Ex. 2 at CONN-VDAVIS000037).

---

[3] The hearing transcript reads "What we can do is set you up that way, I can stop these calls for you." Respectfully, Claimant believes the agent said "Well what day can we set you up? That way I can stop these calls for you."

10

In sum, there is no call where a reasonable juror or, in this case, the arbitrator would conclude that Claimant expressly re-consented to receiving ATDS calls to her cell phone. She never indicated she did not understand the terms of her agreement, that she needed to be educated, or that she was thankful for the phone calls. In an attempt to make the information easier to interpret, Claimant has attached a table containing her position regarding revocation and express consent with respect to each call either side contends is at issue. See **Exhibit 2**.

Moreover, Respondent's argument that it had to keep calling Claimant "in accordance with the contract" is flawed because nothing in the TCPA would have stopped Respondent from making manual calls or sending written correspondence to the Claimant. All the TCPA governs are automated calls made without human intervention at the time of dialing. If Respondent truly took a "conservative approach" to TCPA compliance, it would immediately stop using the automatic dialer and would make calls to Claimant in TCPA Compliance Mode, which does not utilize the Noble Dialer (because, obviously, it is an automatic telephone dialing system.) Instead, however, Respondent bombards customers with automated calls because they are extremely inexpensive to make and are purposefully intended to drive customers crazy, pressuring them to make payments as quickly as possible in an effort to stop the calls (of course, we saw several instances where the system is so automated that it did not stop calling Claimant even after she made a payment).

**3.      Showing a Willful or Knowing Violation for Treble Damages**

The TCPA is a strict liability statute, it does not require any showing of intent, except when awarding treble damages. There is no binding decision from the Sixth Circuit Court of Appeals, nor is there an opinion from any district court in Tennessee as to what constitutes a willful or knowing violation. However, a few district courts within the Sixth Circuit have issued


opinions on the matter. By way of example, in *Harris v. World Fin. Network Nat'l Bank*, 867 F. Supp. 2d 888 (E.D. Mich. 2012) the plaintiff received automated calls to his cell phone because his cell phone number was erroneously associated with the delinquent account of a stranger named Morgan.  Eventually, on August 23, 2010, the plaintiff answered one of the calls and told the defendants they had the wrong number.  The defendants continued to call the plaintiff's cell phone. The court explained that prior to August 23, 2010, defendants' phone calls were violations of the TCPA, but could not have been willful or knowing, because they did not know they had the wrong number:

> [P]rior to Plaintiff notifying Defendants on August 23, 2010, Defendants could not have known that Plaintiff's 1233 number was not Morgan's phone number. Without knowing that the number associated with Morgan's account was actually Plaintiff's number, Defendants' violations cannot be deemed willful or knowing.

*Id.* at 895.  However, the calls defendants made after August 23, 2010, once they were given notice, were found by the court to be willful or knowing.  *Id.* at 896.

The facts in *Currier v. PDL Recovery Grp., LLC*, No. 14-12179, 2017 U.S. Dist. LEXIS 25240 (E.D. Mich. Feb. 23, 2017) are more similar to the instant case. In *Currier*, the defendant initially had the plaintiff's consent to call, but the plaintiff revoked that consent and the defendant kept calling anyway. In finding the defendant's violations to be willful or knowing the court stated, "In order for Plaintiff to prove that Defendants knew that they acted in a manner that violated the statute ... Plaintiff must ... show that the Defendants knew that Plaintiff did not consent to the phone calls." *Id.* at *26-27.  "Defendants were put on notice, as of February 2014, that Plaintiff no longer wished to receive phone calls from PDL. Despite this, PDL agents failed to make any notation in Plaintiff's account notes to reflect his requests and acted in reckless disregard of Plaintiff's rights under the TCPA." *Id.* at *27.

12

This case is like *Currier*. As of March 13, 2017 (and arguably months before then), Conn's was put on notice that Claimant no longer wished to receive phone calls from Conn's. Despite this, Conn's agents either failed to make any notation in Claimant's account (or, worse, *did* notate that Claimant said she was going to sue Conn's about the phone calls) and acted in reckless disregard of Claimant's rights under the TCPA. Therefore, just as in Currier, each phone call Conn's made in either broadcast or "system assisted" mode after March 13, 2017 was a willful or knowing violation of the TCPA.

Conn's engages in institutionalized disregard for consumers' TCPA rights. Time and again we heard recordings of phone calls where it was obvious to any reasonable person that Claimant *hated* that Conn's called her. And after each time we heard the Senior Manager of Compliance for this "very, very conservative compliance-oriented company" testify that Conn's was right to continue calling Claimant.

```
16  Q.     I actually agree with you for once today.  We
17  should listen to the call in its entirety.  And you
18  read me one sentence.  What about when she said she's
19  going to get a lawyer and sue you for harassment?
20  A.     I'm not sure what your question is.
21  Q.     Should you continue to call someone that says
22  I'm going to get a lawyer and sue you for harassment?
23  A.     There's nothing preventing us to make
24  additional call attempts to a customer.  If the
25  customer is represented by an attorney, then that's a
 1  different type of situation, by which we would ask
 2  the customer what's the name of the attorney, the
 3  name and phone number.  Then we have an attorney
 4  handling policy and procedure for that.  That's
 5  different than what we heard here in this phone call.
 6  Q.     So you believe, based on one, your compliance
 7  training throughout the industry, two, your position
 8  as the senior manager of compliance for Conn's that
 9  Ms. Davis wanted you to continue calling her after
10  that call?
11  A.     Not only do we believe it, I mean, we just
12  heard that.
```

```
13  Q.     Right.  But you said we have to look at the
14         totality of the call.  And so you would tell your
15         agents if you listened to that call, I think this is
16         someone we should continue to call?
17  A.     Yes.  Based on the customer's wishes on this
18         phone call.
```

(Tr. 194:16-195:18).  After listening to two recordings from June 15, 2017, where Claimant stated "I get so sick of y'all calling. Please stop calling my phone," "I wish you'd make a note of it," "why do you y'all keep calling me?" and "Y'all just stressing me out. Stop calling my phone,"  Conn's Senior Manager of Compliance testified that he still believed Claimant wanted Conn's to keep calling her:

```
24  Q.     So you thought after that that Ms. Davis
25         wanted to continue to receive phone calls from you?
 1  A.     Yes.
```

(Tr. 256:24-257:1). To this day, Conn's feels that its actions were entirely appropriate. In its Pre-Hearing Brief, Conn's referred to these TCPA actions as "meritless". *See Krakauer v. Dish Network LLC*, No. 1:14-CV-333, 2017 U.S. Dist. LEXIS 77163, at *35 (M.D.N.C. May 22, 2017) (in awarding treble damages the court noted, "Dish characterized people who pursued TCPA lawsuits not as canaries in the coal mine, but as 'harvester' plaintiffs who were illegitimately seeking money from the company."). In spite of hundreds of legal actions taken against Conn's for violating the TCPA, and several six-figure verdicts, Conn's continues to flout the law—it's just a cost of doing business to Conn's. *Id.* at *35 ("The Compliance Agreement did not cause Dish to take the TCPA seriously, so significant damages are appropriate to emphasize the seriousness of such statutory violations and to deter Dish in the future.").

We heard Conn's boast about its conservative compliance policy, but saw no evidence the policy is actually enforced. *See* (Tr. 156:5; 282:17-21; 338:22-339:3) (where Conn's head of Compliance repeatedly concedes he did not even interview the agents who spoke to Claimant).

Moreover, to accept the idea that the policy is enforced, but that Claimant just happened to speak with the only 6 rogue agents out of 800 who failed to properly notate her account and remove her number, would require accepting near impossible coincidence over common sense.

In its closing, Conn's implied that what Claimant endured in this case was a mere inconvenience, harkening back to the 1980s while asking rhetorically "you want to talk about abuse?" Then Conn's explained to Claimant what harassment really is—"Okay? *That's* harassment;" Conn's couldn't resist "educating" Claimant just *one more time*. (Tr. 443:12-444:4); *see Krakauer* at *36 ("Dish also contends that the harm caused was only a 'minor nuisance' and 'inconvenience.' Dish's description has left out 'illegal,' not to mention 'infuriating.'").

Conn's routinely adopts this "Colonel Jessup" defense.[4] Conn's acts as if the law doesn't apply to them, acts as if they didn't understand that Claimant did not want to be called, acts as if they sincerely believed they were actually *helping* Claimant, acts as if each individual agent justifiably operates in some sort of vacuum that excuses Conn's conduct, disregards the number of times they've been found to have violated the TCPA, and to this day acts as if they've done nothing wrong—*that's* willful. Therefore, treble damages are appropriate for each of the calls Conn's made to claimant's cell phone in violation of the TCPA after March 13, 2017. *Id.* at *34 ("The Court concludes that treble damages are appropriate here because of the need to deter Dish from future violations and the need to give appropriate weight to the scope of the violations.").

6. **Request for Damages**

---

[4] *See* A Few Good Men (Colombia Pictures, 1992) where Colonel Nathan Jessup sanctions an illegal "code red" against Marine Private First Class William Santiago, then unapologetically contends it was for Santiago's own good, refuses to acknowledge that he has done anything wrong, and mistakenly assumes that he is above the law only to be faced with the ultimate realization that he will be held to account for his unlawful conduct.

Based on what Conn's agent told Claimant in the store—that she would be fine so long as she paid on or before the 15th, that Conn's had a grace period—Claimant could make a well-reasoned argument for fraudulent misrepresentation. Claimant isn't making that argument. Based on Claimant's notice to Conn's that she would never pay on the 5th, but that it would probably be 4-5 days after that, or her repeated notices to Conn's that she would pay on or before the 15th, Claimant could make a well-reasoned argument under *Schweitzer* that as of September 8, 2015 she revoked consent to be called on or before the 15th of each month.[5] Claimant is not making that argument either. Claimant could argue that the first time she complained of harassment and threatened to get a lawyer, on January 11, 2017, Conn's had reason to know that Claimant was no longer willing for it to continue calling her. And if not the first time, then certainly when she threatened Conn's the second time that same day. Claimant is not making that argument either.

Rather, the first revocation Claimant asserts is on March 13, 2017. Conn's placed 306 calls to Claimant's cell phone after that date, using its ATDS. At the statutory minimum of $500 per violation, Claimant is entitled to $153,000. However, each violation was clearly willful and/or knowing, therefore entitling Claimant to treble damages totaling $459,000. It is worthy of note that Claimant also revoked consent on May 9, 2017, June 15, 2017, June 15, 2017 (again), July 13, 2017, October 11, 2017, October 12, 2017 and October 13, 2017.

---

[5] *Schweitzer v. Comenity Bank*, 866 F.3d 1273, 1280 (11th Cir. 2017) (applying *Osorio* and holding that consent can also be partially revoked depending on context).